Simmons *v.* Mullen, Appellant et al.

Argued April 9, 1974. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*James R. Barozzini,* with him *Weis & Weis,* for appellant.

*James R. Duffy,* with him *Cosmos J. Reale,* and *Mc-Ardle, McLaughlin, Paletta & McVay,* for appellees.

OPINION BY SPAETH, J., December 11, 1974:

This case arises from an accident in which appellee, Jean Simmons, a minor, was hit by an automobile driven by appellant, Geraldine Mullen. Originally there were several defendants but the jury returned a verdict only against appellant. The verdict was $25,-000 for appellee and $549.60 for her father, to cover medical expenses. The issues are whether there was error in the charge, whether expert testimony was erroneously admitted, and whether the verdict was excessive.

The accident occurred on Pioneer Avenue in Pittsburgh at approximately 3:15 p.m. Pioneer Avenue runs north and south and has four lanes and abutting sidewalks. Appellee, aged seven years and seven months, was returning home from St. Pius Grade School. She was walking north from the school on the east sidewalk of Pioneer Avenue. A number of children were on both sides of the street. An open trench stretched across the sidewalk to the center of the street. Backhoe equipment blocked the sidewalk. Dirt from the excavation was in a pile, variously described by witnesses as three to six feet high, which extended from the east sidewalk to the center of the street. When appellee reached the excavation, she left the sidewalk and ran across the street toward the west sidewalk. She was within a foot or two of the opposite curb when

she was struck by appellant's southbound car. Appellee's witnesses estimate the car's speed at 25 to 30 miles per hour.

Appellant, who resided in the general area, had driven through this section of Pioneer Avenue on other days at this time to attend her scheduled classes at Allegheny Community College. On those occasions she had observed school children on both sides of the street, but the sidewalk and street had not been blocked. Appellant testified that on the day of the accident she could not have been driving more than 15 miles per hour because she knew the area was a school zone. She explained further that she waited in front of the dirt pile to let some oncoming cars turn around her. She said she then proceeded forward at about 10 miles per hour and saw children on the right (west) sidewalk but not on the left side. Cross-examination revealed that she never looked to the left as she passed the dirt pile and therefore did not see appellee until appellee was directly in front of her right headlight.

The collision knocked appellee into the air and she landed unconscious. She was placed under the care of Dr. Gray and his associates at Mercy Hospital where she remained for five days. The diagnosis was "cerebral concussion and multiple contusions and abrasions." An electroencephalogram administered on June 10, 1970, was abnormal, but a repeat test in November registered a normal response. Dr. Gray found no demonstrable organic abnormalities thereafter. Continued complaints by appellee and her family, including alleged emotional changes, caused Dr. Gray to recommend psychological evaluation, and he referred appellee to Robert Romano, Ph.D., a clinical psychologist who, after conducting several interviews and a variety of psychometric tests, concluded that appellee had suffered minimal organic brain damage.

I

Appellant claims that the trial court erred in its charge to the jury. The contested portion of the charge is as follows: "There is also a rule of law that normally when a pedestrian is crossing between intersections, as crossing a street in the middle of a block, it must be shown that the pedestrian was in the highway and visible to the driver of an automobile for a sufficient length of time and far enough away so that the driver is able to bring his vehicle under control or to take other action to avoid striking the pedestrian. *However, in the instant case, this rule is modified as to whether or not the surrounding circumstances of this case, the children coming home from school, the barricade on the highway should have apprised the driver, Defendant Mullen, on notice of possible pedestrians, i.e., children, darting into the street, and whether Defendant Mullen had her car under control as to meet the conditions of this particular street at this particular time.* (Emphasis added.) Specifically, appellant argues that the charge was an incorrect statement of law because it placed on her the duty to anticipate children darting into the street. She submits that the charge should have been that an operator of a car is not responsible if a child suddenly runs from a place of safety into the path of the vehicle.

In some circumstances this claim would be correct. However, a driver's "duty is governed entirely by the circumstances" of the particular case. *Purdy v. Hazeltine,* 321 Pa. 459, 461, 184 A. 660, 661 (1936). Ordinarily an automobile driver is only negligent if the evidence shows that the child was on the highway and visible for a sufficient period of time to give the driver a reasonable opportunity to see him and to avoid an accident. *Flagiello v. Crilly,* 409 Pa. 389, 187 A. 2d 289 (1963); *Lucas v. Bushko,* 314 Pa. 310, 171 A. 460

(1934); *Cupelli v. Revtai,* 218 Pa. Superior Ct. 277, 275 A. 2d 673 (1971). A driver is therefore not required generally to anticipate a child's sudden dash into the path of his car. *Jones v. Spidle,* 213 Pa. Superior Ct. 81, 245 A. 2d 677 (1968); *Poulson v. Gamble,* 197 Pa. Superior Ct. 300, 178 A. 2d 839 (1962). If at a given place, however, there is something to warn the driver that he should expect such heedless acts, it becomes his duty to exercise a higher degree of care than under ordinary circumstances. *Geiger v. Schneyer,* 398 Pa. 69, 157 A. 2d 56 (1959); *Ondrusek v. Zahn,* 356 Pa. 537, 52 A. 2d 461 (1947); *Purdy v. Hazeltine, supra.*

Here, appellant was proceeding through an elementary school zone when school was dismissed. She knew that school was dismissed at this time and that when it was, children used both sides of the street, and she saw that children were in fact present. Moreover, she had noticed that the east sidewalk was blocked by construction equipment and the pile of dirt. The law has recognized that special care is required for the protection of children who congregate in the vicinity of a schoolhouse. *Stevenson v. Sarfert,* 310 Pa. 458, 165 A. 225 (1933); *Mulhern v. Phila. Homemade Bread Co.,* 257 Pa. 22, 101 A. 74 (1917). The tendency of small children to dart across streets near schools cannot be ignored by drivers. *Rankin v. Ward Baking Co.,* 272 Pa. 108, 116 A. 58 (1922). Further, the obstructions here meant that the children had reason to leave the sidewalk and that appellant's scope of vision must have been limited. These circumstances should have warned appellant to expect heedless acts of children, and it thereby became her duty to exercise a higher degree of care than under ordinary circumstances.

In *Robb v. Miller,* 372 Pa. 505, 94 A. 2d 734 (1953), a five year old boy ran into the street in front of his school from between two parked cars. The defendant's

car, going 25 to 30 miles per hour, hit him, inflicting fatal injuries. The court explained that this was not a "darting out" case in the usual sense. "While drivers are not required to anticipate that a 'child will run from a place of safety into the path of oncoming vehicles, as many of our cases hold, they (the drivers) are always charged with care under the particular circumstances." *Id.* at 507, 94 A. 2d at 735. The court held that since the driver knew that children were in movement around their school and that his vision was impaired by the parked cars, his failure to respond to these dangerous circumstances constituted negligence. Quoting from *Frank v. Cohen*, 288 Pa. 221, 225-226, 135 A. 624, 625 (1927), the court said: "[T]he presence of children in large numbers in his immediate way, should have caused him (the driver of an automobile) to exercise the degree of care their presence required. . . . It becomes his duty, in passing through or by these groups, to *bring his car under such control that it can be stopped on* the shortest possible notice." Similarly, in this case the dangerous condition on Pioneer Avenue required a higher than ordinary degree of care. Appellant should have been on notice of possible darting children and should have kept her car under sufficient control to meet the particular conditions confronting her. The trial court was not in error when it so informed the jury.

## II

Appellant next contends that the trial court abused its discretion in allowing the depositions of the two expert witnesses, George H. Gray, M.D., and Robert Romano, Ph.D., to be read to the jury.[1] She specifically argues that Dr. Romano was not qualified to

---

[1] All of the expert testimony was presented by depositions read at trial.

speak on organic brain problems, that his testimony was inadmissible because it was based on equivocal data, that he was not qualified to testify on the causal link between the brain damage and the accident, and that all the expert testimony was inadmissible because it was contradictory.

As mentioned initially, Dr. Gray treated appellee for temporary injuries including a concussion and multiple abrasions, but testified that when he could find no evidence of permanent "organic abnormalities," he recommended a psychological evaluation and referred appellee to Dr. Romano, a clinical psychologist. Dr. Romano testified as follows: He interviewed appellee and her mother and had his assistant administer a battery of tests to ascertain whether there was either emotional or organic malfunction. He also said that from the results of the interview and the tests he concluded that appellee was somewhat disturbed and that there was some erratic intellectual functioning. These problems were, in his opinion, due in part to emotional pressure from adults and in part to minimal organic brain damage. By "organic brain damage", Dr. Romano explained that he meant that something was "amiss in the child's central nervous system . . . in the way she perceives and responds to her perceptions." This would in turn cause her to have difficulty in learning to read and with verbal conception. He felt visual retraining would be helpful. Dr. Romano candidly admitted that his conclusions were based on "mixed and equivocal data." Dr. Gray accepted Dr. Romano's opinion as accurate and attributed appellee's injuries to the accident. During his deposition, when questioned initially by appellee's counsel, Dr. Romano did not testify on the causal relationship between the brain damage and the accident. However, on cross-examination he was asked by appellant's counsel whether he could with "medcial certainty in the field

of psychology" say that appellee's condition was caused by the accident, and he replied affirmatively. When counsel for one of the co-defendants pressed this question on cross, Dr. Romano said he was unable to formulate an opinion with "medical certainty." Finally on re-direct the examination went as follows: "Q. And just so that we have it clear, Doctor, when you formed an opinion that this girl did have, in addition to some of the emotional problems which you indicated, that she did have minimal brain damage. In view of the history of an automobile accident and neurological treatment by Dr. Hershey or Dr. Gray— A. Yes. Q. —(continuing) can you state with reasonable medical certainty whether you have an opinion as to the cause of this minimal brain damage which you found; and if so, what that cause would be? A. Yes. I am just stumbling over your term "medical." We have to keep in mind that I am not a medical person. Q. I think my question was with reasonable professional certainty. A. Okay. Yes, I feel that this youngster's minimal brain damage results from the trauma she received in the accident."

## A.

The first issue is whether Dr. Romano was competent to testify as an expert on organic brain malfunctions.[2] We think he was.

Preliminarily, it is clear that Dr. Romano was an eminently qualified psychologist. He received a Bachelor's degree from Cornell University in 1947, a Master's degree from the University of Missouri in 1951, and his Ph.D. in clinical psychology from Washington

---

[2] Clinical psychologists have been acknowledged as experts qualified to testify on diagnosis, prognosis, and causation of emotional disturbance. *United States v. Riggleman*, 411 F. 2d 1190 (4th Cir. 1969); *Saul v. State*, 6 Md. App. 540, 252 A. 2d 282 (1969); *Reese v. Naylor*, 222 So. 2d 487 (Fla. App. 1969).

University in St. Louis in 1954. He interned for two years with the Veterans Administration at several hospitals and clinics and was Assistant Chief Psychologist at Leech Farm V. A. Hospital in Pittsburgh for three years. Since 1959 he has been in private practice. In the opinion of Dr. Gray, "this man is most excellent in his field."

An expert witness is one who due to the "possession of knowledge not within ordinary reach is specially qualified to speak upon the subject to which his attention is called." *Steele v. Shepperd,* 411 Pa. 481, 483-484, 192 A. 2d 397, 398 (1963), quoting *Struthers v. The Phila. & Del. Co. R. Co.,* 174 Pa. 291, 298, 34 A. 443 (1896).[3] It is not essential that an expert witness be a medical practitioner to testify on organic problems. Non-medical persons have been permitted to testify within their special knowledge. *Jackson v. Waller,* 126 Conn. 294, 10 A. 2d 763 (1940) (optometrist) ; *Reynolds v. Davis,* 55 R.I. 206, 179 A. 613 (1935) (toxicologist). In accord with the general rule, therefore, "anyone who is shown to have special knowledge and skill in diagnosing and treating human ailments is qualified to testify as an expert. . . ." *Jenkins v. United States of America,* 307 F. 2d 637, 644 (D.C. Cir. 1962).

When dealing with the brain, consultation with non-medical practitioners may be not only desirable but necessary. Dr. Gray so indicated at the trial: "Q. Doctor, I wonder if you would explain for the Court and Jury the relationship of a clinical psychologist to

---

[3] Accord: McCormick on *Evidence,* §13, pp. 28-29 (2d ed.) : "To warrant the use of expert testimony . . . two elements are required. First, the subject of the inference must be so distinctly related to some science, profession, business or occupation as to be beyond the ken of the average layman. . . . second, the witness must have such skill, knowledge or experience in that field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth." Proposed Federal Rule 702 also adopts these criteria.

a neurosurgeon such as yourself. What does a clinical psychologist do for yourself? A. Well, primarily in our business, if we have a patient who has complaints, particularly with those complaints representing the possibility of emotional disfunction, behavioral dis-turbance, things that we cannot measure on the basis of what we can see, things that we cannot measure on the basis of our detailed examinations—with that par-ticular history, we then refer those patients for psycho-metric evaluation and request then of our psychologist who is doing the examination whether, by his battery of tests, he can or cannot tell us whether he believes there is evidence of disturbance as far as brain function is concerned, whether this would be on the basis of possible organic disturbance or on the basis of psycho-logical disturbance. Q. And is the psychologist proper-ly capable of determining by his course of tests and his examination, whether the problem is, the problem that your patient is having, is primarily emotional or primarily organic or having to do with the brain, itself, or a combination of both? Is that a fair statement? A. Yes. We feel very strongly that Dr. Romano can. He has worked with us many, many years and is one of the two psychologists that, in our practice over this period of time, we have come down to, and the only one that we use from the standpoint of this type of testing, because I think that this man is most excellent in his field and we rely heavily on what he reports to us." To adopt appellant's view that psychologists are not competent witnesses to testify on physical matters would be to ignore present medical and psychological practice.[4]

---

[4] The General Assembly, too, has recognized that certain brain abnormalities, particularly mental retardation, require determina-tion by psychological rather than medical examination. Pennsyl-vania Mental Health Act of October 20, 1966, P. L. 96, Art. IV, §404, 50 P.S. §4404.

## B.

Dr. Romano's testimony that appellee had minimal brain damage did not have to be excluded merely because it was based on "equivocal and mixed data." It is true that testimony based on data so scanty that the witness's inferences are mere guesses should not be admitted. II Wigmore, Evidence §658 (3d ed. 1940). This does not mean, however, that a witness's statement of opinion has to be positive or absolutely certain. "[I]t suffices if [the witness] had an opportunity of personal observation and did get some impressions from this observation." *Id.* "The law does not require that . . . [expert] testimony amount to dogma or that it foreclose the exercise by the jury of its function to determine the ultimate fact." *Brett v. J. M. Carras, Inc.,* 203 F. 2d 451, 453 (3d Cir. 1953). The reason for this rule is that if a source of knowledge is insufficient, its weakness may be exhibited to the jury, which can then determine for itself how much weight to accord the testimony. Wigmore §659.

Here Dr. Romano admitted that his opinion was not certain. He, however, carefully explained the testing procedure, the tests used, and how the test results were interpreted. This gave the jury ample opportunity to analyze his methodology and to assess its value. The equivocal nature of the data therefore was not grounds for exclusion, but only a factor to be considered in evaluating his testimony.[5] The admonition of Dean Wigmore must always be kept in mind: "The risk of excluding a useful . . . item of testimony is greater than the risk of admitting testimony capable of exaggeration." Wigmore §659.

---

[5] It should further be noted that the neurosurgeon, Dr. Gray, was willing to accept the opinion even though it was based on mixed facts.

## C.

Appellant next contends that even if it was not error to allow Dr. Romano to testify on the existence of brain damage, it was error to allow him to testify that the damage was caused by the accident. She argues among other things that only physicians can determine causation. We agree that Dr. Romano's testimony on causation was improper. His testimony on the existence of brain damage was preceded by explanation of why the clinical psychologist was peculiarly able to detect defects that a neurosurgeon could not. His methods were fully examined. Nowhere in the record, however, is there any indication that these methods expose anything more than the mere existence of defects. Perhaps a psychologist is able to ascertain causation, but the record does not support this conclusion. This error, however, does not warrant a new trial, for it was harmless.

First, expert testimony did not appear to be necessary to show causation. Clearly, a plaintiff has the burden of establishing that his injuries were proximately caused by the defendant's negligence. Medical testimony, however, is not always necessary to make the causal link. In *Tabuteau v. London G. & A. Co., Ltd.,* 351 Pa. 183, 40 A. 2d 396 (1945), the plaintiff tripped on an uneven sidewalk and suffered immediate pain in his groin. Medical examination revealed a hernia. The court held that expert testimony was not required to show proximate cause since the injury was so "immediately and directly, or naturally and probably," the result of the accident. *Id.* at 186, 40 A. 2d at 398. Only when the cause of the injury is not readily apparent is there a need for medical testimony. *Washko v. Ruckno, Inc.,* 180 Pa. Superior Ct. 606, 121 A. 2d 456 (1956). Here, appellee was hit on the head in the accident, as evidenced by the bruise on her

skull. Just as the hernia was considered the immediate and direct result of the plaintiff's misstep in *Tabuteau v. London G. & A. Co., Ltd., supra,* appellee's injury here could be considered the immediate and direct result of the blow to her head.

Second, assuming that expert testimony was necessary to show causation, Dr. Gray's testimony was enough: "Q. And again, Doctor, is Dr. Romano capable based on his test and his training as far as you are concerned to make this type of a psychological diagnosis of the child? A. In my opinion, he is. Q. And as a medical doctor and a specialist in neurosurgery, do you accept his conclusion based on these psychological tests that this child does have minimal brain damage? A. I do. Q. Now, Doctor, based on the history of the accident which you received, and the condition of this child as was evidenced from her admission in Mercy Hospital, and her subsequent course of visits with you, do you have an opinion with reasonable medical certainty as to the cause of the neurological conditions which you and your service treated? A. Yes. Assuming that the history we have received is correct, it is our opinion that the findings which the child showed at the time we saw her, and while under our treatment, was related to the accident described in the history."

Third, Dr. Romano was not asked for his opinion on causation on direct examination but on cross. His answers on re-direct were merely to clarify the answers provided on cross. Appellant cannot now come before this court and seek a new trial for testimony initiated by her own counsel.

## D.

Finally, appellant claims that all the expert testimony should have been excluded because it was contradictory. Contradiction among a party's experts is only fatal, however, if there are absolute conflicts in

their ultimate conclusions. *Menarde v. Philadelphia Transportation Company*, 376 Pa. 497, 103 A. 2d 681 (1954) ; *Fady v. Danielson Construction Company*, 224 Pa. Superior Ct. 33, 302 A. 2d 405 (1973). It is true that Dr. Gray testified that he could find no organic brain damage, while Dr. Romano said there was minimal damage. Dr. Romano, however, only entered the case because the neurosurgical team could not find the source of appellee's difficulties. His consultation was specifically requested to supplement the medical examinations. His conclusion, and testimony, therefore supplemented rather than contradicted Dr. Gray's, and in fact, as has been noted, Dr. Gray explicitly so testified.

### III

Appellant's last contention is that the damage award of $25,000 was excessive.

The determination of damages is initially within the discretion of the jury, for it is the jury's task to weigh the evidence and assess credibility. The granting or refusal of a new trial because of an excessive jury verdict is, in turn, within the discretion of the court below and should not be disturbed absent clear abuse. *Guzman v. Bloom*, 413 Pa. 576, 198 A. 2d 499 (1964) ; *Hall v. George*, 403 Pa. 563, 170 A. 2d 367 (1961). Accordingly, an appellate court should be exceedingly reluctant to interfere with a verdict found by the lower court not to be excessive. *Skoda v. West Penn Power Co.*, 411 Pa. 323, 191 A. 2d 822 (1963). Thus we have said that we shall not find a verdict excessive unless it is so grossly excessive that it shocks our sense of justice. *Fallon v. Penn Central Transp. Co.*, 444 Pa. 148, 279 A. 2d 164 (1971) ; *Flank v. Walker*, 398 Pa. 166, 157 A. 2d 163 (1960) ; *DeSimone v. Philadelphia*, 380 Pa. 137, 110 A. 2d 431 (1955).

The argument that in the present case our sense of justice should be shocked depends upon an appraisal of appellee's injuries. We find this appraisal difficult, for it must be admitted that the jury's verdict might have been much less, and that the record could be read as disclosing only minor and transitory injuries. The total medical expenses were only $549.60;[6] Dr. Gray found no brain damage; Dr. Romano found only "minimal" brain damage, and although Dr. Romano felt visual retraining desirable, no retraining program has been undertaken, which suggests that after all appellee does not really need it, which in turn suggests that whatever brain damage there may have been was indeed very slight.

Nevertheless, the fact of disparity between the amount of out-of-pocket expenses and the amount of the verdict is not by itself sufficient basis to award a new trial. *Murphy v. Taylor*, 440 Pa. 186, 269 A. 2d 486 (1970); *Zawoyski v. Pittsburgh Rwys. Co.*, 415 Pa. 563, 204 A. 2d 463 (1964). Every aspect of the case must be examined. When this is done, there is enough in the record to persuade us that the jury was not acting vindictively or irrationally or out of undue sympathy for appellee, and that we should not disturb its verdict, even though it might not have been the verdict we should have reached.

As has been noted, appellee was knocked unconscious by appellant's car, and did not regain consciousness until she arrived at the hospital, where her injuries were diagnosed as cerebral concussion and multiple contusions and abrasions. Appellee's mother testified that she noticed behavioral changes in appellee at home after the accident. Unnecessary crying and anxiety become commonplace, especially if another

---

[6] Dr. Gray's bill was $105.00, Dr. Romano's $150.00, and Mercy Hospital's $294.60.

person was injured. Appellee also started to exhibit uncharacteristic forgetfulness. She would turn lights on upstairs apparently without understanding what she was doing and would start to eat snacks and then forget she had started. In addition, her mother testified that appellee's teachers were troubled by appellee's sudden lack of interest in school. "Something was missing" in her classroom work. This testimony was consistent with Dr. Romano's opinion that appellee had suffered minimal brain damage that would cause her to have difficulty in learning to read and with verbal conception. It was also consistent with Dr. Gray's opinion that the brain damage reported by Dr. Romano was caused by the accident.

Taking all these facts together, an award of $25,-000 does not seem unreasonable. No doubt the jury could have rejected the mother's testimony, as well as the doctors', or could have regarded it as exaggerated or unduly anxious. It is apparent from the verdict, however, that the jury accepted the testimony of appellee's witnesses in full. That was within the jury's power. Having decided to accept the testimony, the jury must have found itself presented with a troublesome decision. Appellee is very young, and her injury is, in a sense, invisible, and its future manifestations difficult to predict. The jury could have concluded that the edge of a bright and sharp personality has been permanently dulled. In these circumstances we cannot say that the verdict, and the approval of the verdict by the court below, shock our conscience.

Affirmed.