J-A28017-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| CYNTHIA VALENTINE | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MARTIN ELFANT INC. REAL ESTATE, | : | No. 3565 EDA 2016 |
| MARTIN ELFANT INC. REAL ESTATE | : | |
| AND J. MALVERN BENJAMIN, JR. | : | |

Appeal from the Order Entered June 15, 2016
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s):  April Term, 2014 No. 01727

BEFORE:  GANTMAN, P.J., PANELLA, J., and DUBOW, J.

MEMORANDUM BY PANELLA, J.                    **FILED MAY 29, 2018**

Cynthia Valentine appeals from the order dismissing her complaint alleging that she was injured after negligently maintained stairs caused her to fall. After careful review, we affirm.

We assume the parties' familiarity with the relevant factual background. For a detailed recitation, see the trial court's opinion, dated May 12, 2017. Valentine filed her slip and fall complaint in 2014. According to the initial scheduling order, Valentine's expert reports were due by July 6, 2015.

The deadline was extended to September 7, 2015, by a revised case management order. A subsequent case management order extended the overall discovery deadline to February 19, 2016. However, this order did not explicitly address the deadline for expert reports.

The court granted Valentine two continuances due to her attorney's unavailability to start trial. Thereafter, Valentine retained new counsel. He entered his appearance on behalf of Valentine, and a third continuance was granted. However, the order indicated the trial court would grant no further continuances. Trial was set to start on June 10, 2016.

On May 31, 2016, Valentine submitted an expert report from Richard Hughes, P.E. Appellees, Martin Elfant Inc. Real Estate Company and J. Malvern Benjamin, Jr., filed a motion *in limine* to preclude the testimony of Hughes shortly thereafter.

On June 8, 2016, Valentine submitted an expert report from Mark D. Allen, M.D. The next day, Appellees filed a motion *in limine* to preclude Dr. Allen's testimony.

Prior to trial, the court heard arguments on Appellees' motions. The court precluded the testimony of Hughes and Dr. Allen, noting the submissions were untimely and prejudiced the Appellees.

Appellees then made an oral motion for nonsuit, based upon their belief that Valentine could present no expert testimony on causation. Valentine conceded. And the court granted Appellees' motion for nonsuit.

Valentine filed a motion to strike the nonsuit. The court refused to remove the nonsuit, and Valentine filed this appeal. Valentine purported to appeal from the order denying her motion to remove the nonsuit.

Upon reviewing the docketing statement, this Court concluded the order confirming the nonsuit was not a final, appealable order and directed Valentine to have judgment entered on the order pursuant to **Billig v. Skvarla**, 853 A.2d 1042 (Pa. Super. 2004). Valentine complied with our directive.

Despite this, we must address the issue of our jurisdiction to entertain this appeal. We begin by noting the question of timeliness of an appeal is a jurisdictional issue, as an untimely appeal divests this Court of jurisdiction to hear the merits of the case. **See Sass v. Amtrust Bank**, 74 A.3d 1054, 1063 (Pa. Super. 2013). As such, we may inquire into timeliness of the appeal at any time. **See Murphy v. International Druidic Society**, 152 A.3d 286, 289 (Pa. Super. 2015).

Usually, a party's notice of appeal must be filed within 30 days of the entry of the order that it is appealing. **See** Pa.R.A.P. 903(a). Further, we will not deem a facially untimely appeal to be timely "except under the narrowest of circumstances in which counsel for the offending party can establish either a breakdown in the operations of the judicial support system or extenuating circumstances that rendered h[er] incapable of filing the necessary notice." **Sass**, 74 A.3d at 1063.

However, a party may generally only appeal from "final orders." Pa.R.A.P. 341(a). In relevant part, a final order is defined as an order that "disposes of all claims and of all parties[.]" Pa.R.A.P. 341(b)(1).

Under this rule, pre-trial orders dismissing a plaintiff's case in its entirety are considered final, appealable orders. ***See***, ***e.g.***, ***D'Elia v. Folino***, 933 A.2d 117, 121 (Pa. Super. 2007). However, a verdict entered after trial is not a final order; judgment entered upon the verdict is the final, appealable order. ***See Billig***, 853 A.2d at 1048. This is true even where post-trial motions are required to preserve issues for appeal. ***See id***.

Nonsuit is appropriate if, after a plaintiff has finished presenting evidence on liability, she has failed to establish a right to relief. ***See*** Pa.R.C.P. 230.1(a)(1). Chronologically, an order granting nonsuit falls between a pre-trial order and a verdict. Because motions for nonsuit occur after trial has started, our courts have treated them like verdicts, as opposed to pre-trial rulings. Thus, "where a nonsuit has been entered the case is not ripe for appeal until after a motion to remove the nonsuit has been presented to the court and denied." ***Billig***, 853 A.2d at 1048.

Since nonsuit can only be entered *after* trial has started, a pre-trial motion for nonsuit should be treated as a *nunc pro tunc* motion for summary judgment or judgment on the pleadings. **See *Rivera v. Home Depot***, 832 A.2d 487, 490 (Pa. Super. 2003). Thus, a post-trial motion to remove the alleged nonsuit is not required, and does not toll the 30-day appeal period. ***See id***. However, where the trial court mistakenly refers to its order as one granting nonsuit, we will not penalize an Appellant for relying on the trial court's description. ***See id***.

- 4 -

Here, the court mislabeled its order as one granting nonsuit prior to the start of trial, rather than summary judgment. Valentine mistakenly followed the procedures required to perfect her right to appeal from the entry of a nonsuit. However, under ***Rivera***, this does not render her appeal untimely.[1] We therefore turn to the merits.

Valentine first argues the court improvidently granted a nonsuit prior to the start of trial. As we have just discussed, we agree this was a technical error, but it is a mere error of nomenclature. This error does not render the court's order invalid. ***See id***., at 490. Thus, Valentine's first issue on appeal does not merit relief.

Valentine's second and third issues assert the trial court erred in dismissing her claims, as she believes expert testimony was not required to establish causation. After reviewing the record and the trial court's opinion on appeal, we conclude the court thoroughly and appropriately addressed these issues. ***See*** Trial Court Opinion, 5/12/17, at 6-8 (finding expert medical testimony was required due to Valentine's delay in experiencing symptoms after the fall). We therefore adopt the trial court's reasoning as our own. Valentine's second and third issue merit no relief.

---

[1] Regardless, we have corrected the appeal statement to reflect the date the court mailed Pa.R.C.P. 236 notice of the order dismissing Valentine's case to the parties. ***See*** Pa.R.A.P. 108(b).

Valentine's final three issues assert claims that the trial court erred in precluding the testimony of Hughes and Dr. Allen. After reviewing the record and the trial court's opinion on appeal, we again conclude the court thoroughly and appropriately addressed these issues. *See* Trial Court Opinion, 5/12/17, at 8-11 (finding Valentine's expert reports were filed well past discovery deadline, and that defendants would be prejudiced because the reports were filed the week before trial began). We therefore adopt the trial court's reasoning as our own. Valentine's fourth, fifth, and sixth issues merit no relief.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/29/18

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL SECTION**

| | | |
|---|---|---|
| CYNTHIA VALENTINE | | |
| | Plaintiff, | SUPERIOR COURT |
| v. | | NO. 3565 EDA 2016 |
| | | |
| MARTIN ELFANT INC. REAL ESTATE, CO. and | | Trial Court Docket: |
| J. MALVERN BENJAMIN, JR. | | April Term, 2014 |
| | Defendants. | Civil Action No. 01727 |

## OPINION

BUTCHART, J.                                                    May 12, 2017

Plaintiff Cynthia Valentine (hereinafter "Plaintiff") appeals the decision of this Court on

October 12, 2016 denying Plaintiff's Motion for Post-Trial Relief.

I.      PROCEDURAL HISTORY

Plaintiff initiated a premises liability claim against Defendants on April 20, 2014. A Case

Management Order was issued on July 25, 2014, requiring the completion of discovery by July

6, 2015. Plaintiff's expert reports were due no later than July 6, 2015. *See* July 25, 2014 Case

Management Order.

Defendants filed a Motion for Extraordinary Relief which was granted by the Honorable

Lisa M. Rau on July 7, 2015. The revised Case Management Order required discovery to be

completed by September 7, 2015. Plaintiff was required to submit expert reports by September 7,

2015. Defendants' expert report deadline was October 5, 2015. *See* July 7, 2015 Revised Case

Management Order.

Valentine Vs 45 East Cliveden Partners, Lp E-OPFLD



14040172700154

Defendants filed a second Motion for Extraordinary Relief, citing scheduling issues with Plaintiff. On December 30, 2015, Hon. Lisa M. Rau moved the matter from the January 2016 trial pool to the March 2016 trial pool. The discovery deadline was extended to February 19, 2016. Plaintiff's expert report deadline was not extended. *See* December 30, 2015 Order.

On March 24, 2016, the Honorable Lisa M. Rau granted Plaintiff's counsel's "last-minute request to continue the trial" and moved the matter to the April 2016 trial pool. *See* March 24, 2016 Order. On April 8, 2016 Plaintiff's second continuance request was granted *See* April 8, 2016 Order.

On April 29, 2016, Jacob N. Snyder entered his appearance on behalf of Plaintiff. New counsel requested a third trial continuance, which was granted. The Order specified that no further continuances would be granted and trial was set for June 10, 2016. *See* May 11, 2016 Order.

On May 31, 2016, Plaintiff submitted an expert report from Richard Hughes, P.E. On June 8, 2016, Plaintiff submitted an expert report from Mark D. Allen, M.D., eight months after Plaintiff's expert report deadline and three months after the discovery deadline. Plaintiff's Pretrial Memorandum did not identify any expert witnesses.

On June 3, 2016, Defendants filed a motion *in limine* to preclude Plaintiff from calling Mr. Hughes as an expert. On June 9, 2016, Defendants filed a motion *in limine* to preclude Plaintiff from calling Dr. Allen as an expert. Both motions argued that Defendants would be extremely prejudiced by the admission of the experts so close to trial when neither was previously disclosed. Defendants noted they had no opportunity to retain a liability expert and would have to expend additional costs to re-depose their medical expert.

2

On June 13, 2016, the Court heard oral argument on Defendants' motions. The Court granted both motions *in limine*, precluding the testimony of both experts. *See* June 13, 2016 Order. The Court determined that the reports were provided substantially beyond the extended discovery deadline and caused extreme prejudice to the Defendant. Notes of Testimony ("N.T."), June 13, 2016 at 17 and 34.

Defendants moved for nonsuit after the Court's ruling, citing Plaintiff's lack of medical evidence regarding causation. N.T., June 13, 2016 at 34-35. Plaintiff conceded that there would be no medical evidence regarding causation with no further response to the motion. *Id.* The Court granted Defendants' motion for nonsuit.

On June 22, 2016, Plaintiff filed a timely post-trial motion. On July 6, 2016, Defendants filed an answer in opposition to Plaintiff's post-trial motion. On August 2, 2016, after reviewing the trial transcript, the Court issued a briefing schedule. Plaintiff filed a timely brief in support of the post-trial motion on August 29, 2016. Defendants filed a timely response on September 30, 2016. On October 10, 2016, Plaintiff filed a reply. On October 12, 2016, following oral argument and upon consideration of all filings, the Court denied Plaintiff's motion for post-trial relief. *See* October 14, 2016 Order.

On October 31, 2016, Plaintiff filed a timely Notice of Appeal. On November 2, 2016, the Court ordered Plaintiff to provide a Concise Statement of Errors Complained of on Appeal pursuant to Pa.R.A.P. 1925(b). On November 21, 2016, Plaintiff filed the following Statement of Matters Complained of on Appeal ("1925(b) Statement"):

1. Whether the Court committed prejudicial error and/or an abuse of discretion in denying Appellant's Motion for Post-Trial Relief where Defendant's Motion for a Nonsuit was improvidently granted.

2. Whether the Court committed prejudicial error and/or an abuse of discretion in denying Appellant's Motion for Post-Trial Relief where Appellant has raised material issues regarding the validity of the grounds upon which the Court granted

3

Defendants' Motion for a Nonsuit, including, but not limited to, all issues raised within Appellants' Post-Trial Motion and Memorandum of Law, and in particular, to wit: The Plaintiff would not have "any admissible medical evidence regarding her injuries."

3. Whether the Court committed prejudicial error and/or an abuse of discretion in denying Appellant's Motion for Post-Trial Relief insofar as Appellant was not required to present expert medical testimony as to causation in order to state a prima facie cause of action for negligence? *Tabuteau v. London G. & A. Co., Ltd.*, A.2d 396 (Pa. 1945); *Lattanze v. Silvestrini*, 448 A.2d 605 (Pa. Super.1982); *McArdle v. Panzek*, 396 A.2d 658 (Pa. Super. 1978).

4. Whether the Court committed prejudicial error and/or an abuse of discretion in denying Appellant's Motion for Post-Trial Relief where Defendants' Motions in Limine to Preclude Expert Medical and Engineering Evidence were improvidently granted?

5. Whether the Court committed prejudicial error and/or abuse of discretion in denying Appellant's Motion for Post-Trial Relief insofar as the Court failed to give due consideration to the factors applicable to determination of whether or not to preclude evidence for failure to comply with discovery? *Williams v. Southeastern Pennsylvania Transportation Authority*, 741 A.2d 848, 855, n.7 (Pa. Cmnwlth. 1999); *Feingold v. Southeastern Pennsylvania Transportation Authority*, 488 A.2d 284, 287 (Pa. Super. 1985); *Konstantopoulous v. Westvaco Corp.* 112 F.3d 710, 719 (3d Cir. 1997).

6. Whether the Court committed prejudicial error and/or an abuse of discretion in denying Appellant's Motion for Post-Trial Relief insofar as the "drastic sanction" of preclusion of evidence should not have been imposed where more appropriate lesser sanctions were available and any prejudice to Defendants could easily have been cured? *Croydon Plastics Co. v. Lower Bucks Cooling & Heating*, 698 A.2d 625 (Pa. Super. 1997); *Cochran v. Jackson*, No. CIV.A. 14-2165, 2015 WL 3555291, (E.D. Pa. June 8, 2015).

Plaintiff's 1925(b) Statement. For the reasons set forth below, Plaintiff's claims are without merit and the rulings of this Court should be affirmed.


II.   FACTUAL HISTORY

On April 20, 2012 at 45-49 E. Cliveden Street in Philadelphia (hereinafter "the property"), Plaintiff, a tenant, alleged that the heel of her shoe caught a crack in the top step and caused her to fall. *See* Plaintiff's Deposition at p. 66, attached hereto as "Exhibit A". Plaintiff

4

was en route to a job interview and continued on her way. *Id.* at 103. She did not experience any pain until two days later when she went to the emergency room. *Id.* at 115. X-rays were taken and were unremarkable. *Id.* Six days after the incident Plaintiff was seen by her primary care physician. Plaintiff's primary care physician ordered an MRI which showed a lower back disc bulge. *Id.* at 116. Plaintiff did not experience neck pain until a week or two after the accident. *Id.* at 117. Plaintiff began experiencing right-sided weakness "a few months" after the fall. *Id.* at 120.

### III.    DISCUSSION

#### A. The Court Properly Considered Defendants' Motion for Nonsuit

Plaintiff argues that this court committed prejudicial error and/or abuse of discretion in denying Plaintiff's Post-Trial Motion because Defendants' motion for nonsuit was "improvidently granted." Plaintiff's claim is without merit.

A motion for nonsuit may not be granted prior to the presentation of evidence by the plaintiff. *Gallagher v. Harleysville Mut. Ins. Co.*, 617 A.2d 790, 796 (Pa.Super. 1992). However, a grant of a motion for nonsuit filed prior to the presentation of evidence is properly characterized as "either a summary judgment grant or grant of judgment on the pleadings…" *Id.* In *Gallagher*, the Pennsylvania Superior Court held that the trial court's action in entering a nonsuit prior to trial could not be characterized as granting nonsuit. Thus, post-trial motions to remove the nonsuit prior to trial were not required under Rule 227.1. *Id.*

In *Lewis v. United Hospitals, Inc.*, 692 A.2d 1055, 1058 (Pa. 1997), the Pennsylvania Supreme Court upheld the reasoning in *Gallagher*, finding that the Superior Court should have treated the motion for nonsuit as a motion for summary judgment and thus allowed a direct appeal. Following the reasoning of both *Gallagher* and *Lewis*, and considering that discovery in

5

this matter was complete, this Court's grant of nonsuit is properly characterized as a grant of summary judgment.

Rule 1035.2 of the Pennsylvania Rules of Civil Procedure states that any party may move for summary judgment in whole or in part, as a matter of law:

> If, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury.

Pa.R.C.P. 1035.2(2). The Superior Court may overturn a trial court's entry of summary judgment only if there has been an error of law or a clear abuse of discretion. *Estate of Swift v. Northeastern Hospital of Philadelphia,* 690, A.2d 719, 722 (Pa. 1997).

Plaintiff failed to timely produce an expert as to medical causation. Based on the relevant case law discussed *infra*, expert testimony as to causation was required in this matter. Plaintiff identified experts and submitted expert reports well beyond the discovery deadline. As Rule 1035.2(2) states, summary judgment is appropriate where the party bearing the burden of proof at trial has failed to produce evidence of facts essential to the cause of action. Defendants' motion for nonsuit, properly characterized as a motion for summary judgment under the reasoning of *Gallagher* and *Lewis*, was properly granted. Plaintiff's first claim is without merit.

## B. Plaintiff Required Expert Testimony to Prove Causation

Plaintiff claims that even if the preclusion of Dr. Allen was proper, Plaintiff should have been permitted to testify as to causation and the extent of her injuries. Plaintiff argues that this case did not require expert medical testimony to establish causation. Plaintiff's claim is without merit.

6

In a personal injury case, the plaintiff must prove the existence of a causal relationship between the injury complained of and the alleged negligent act to recover for the injury. *Hamil v. Bashline*, 392 A.2d 1280 (Pa. 1978). A plaintiff must generally prove causation by expert medical testimony. *Smith v. German*, 253 A.2d 107 (Pa. 1969). However, an exception exists where there is an obvious causal relationship between the two. *Id.* An obvious causal relationship exists where the injuries are either "immediate and direct" or the "natural and probable" result of the alleged negligent act.[1] *Tabuteau v. London G. & A., Ltd.*, 40 A.2d. 396 (Pa. 1945). "The two must be so 'so closely connected and so readily apparent that a layman could diagnose (except by guessing) the causal connection'..." *Id.*

Expert testimony will likely be required in cases where a "significant period of time...elapsed between the injury complained of and the accident and...the injury was not of the type one would normally expect to result from the accident in question either because the accident would not normally produce such an injury or there were other equally likely or more likely causes of the injury." *Lattanze v. Silvestrini*, 448 A.2d 605, 609 (Pa. Super. 1982). Where there is a "significant time lag between the accident and the injury suffered, the courts will

---

[1] "In the following cases it was determined that the injuries complained of were either "immediate and direct" or the "natural and probable" result of the alleged negligent act and, therefore, expert medical testimony was not needed to prove causation: *Schultz v. Pivar*, 370 Pa. 271, 88 A.2d 74 (1952) [sacro-iliac sprain resulting from a fall into a manhole, back pain started immediately after the fall]; *Tabuteau v. London G. & A. Co., Ltd.*, supra, [hernia caused by tripping on an uneven sidewalk, intense pain in groin and nausea felt immediately after the accident, two small lumps in the groin area discovered shortly thereafter]; *Simmons v. Mullen*, 231 Pa.Super. 199, 331 A.2d 892 (1974) [minimorganic brain damage caused by being struck on the head by a car and knocked unconscious]; *Fenstermaker v. Bodamer*, supra, [neck, shoulder and elbow pain developed shortly after an auto accident, doctor prescribed a neck brace and leather collar to ease the pain]; *Munns v. Easthome Furniture Industries, Inc.*, 193 Pa.Super. 61, 164 A.2d 30 (1960) [ruptured cervical disk caused when a sudden gush of compressed air twisted the plaintiff's left arm while he was using a power stapler, pain and numbness in the fingers felt shortly after the accident, pain spread to shoulder and then neck in the following days]; and *Yellow Cab Co. v. Workmen's Compensation Appeal Board*, 37 Pa.Cmwlth. 337, 390 A.2d 880 (1978) [subdural hematoma caused when plaintiff struck his head against the windshield in an auto accident, severe headaches and dizziness started almost immediately after the accident, plaintiff blacked-out one month after the accident]." *Lattanze v. Silverstrini*, 448 A.2d at 608-609.

7

require expert medical evidence of causation." *McArdle v. Panzek*, 396 A.2d 658, 661 (Pa. Super. 1978).

In *Lattanze,* the plaintiff's claimed symptoms manifested on the day of the car accident. In the instant case, Plaintiff did not seek medical attention until two days after the incident and did not have an MRI until April 26, 2016. *See* June 2, 2016 Report of Dr. Mark Allen, attached hereto as "Exhibit B". Additionally, Plaintiff proceeded to her job interview after falling.

This Court determined that expert medical causation testimony was required. Plaintiff conceded that her injuries did not manifest until two days after the injury. Additional injuries claimed by Plaintiff did not manifest until several days and weeks later. Based on the time lapse and Plaintiff's history of previous and subsequent injuries, this Court determined that no obvious causal relationship existed between the alleged negligent act and Plaintiff's injuries. Plaintiff's claim is without merit.

### C. Preclusion of Plaintiff's Experts Was Warranted.

Plaintiff argues that the Court erred or committed an abuse of discretion by granting Defendant's motions *in limine* to preclude her experts. Plaintiff states that the Court failed to give due consideration to applicable factors in determining whether failure to comply with discovery warranted preclusion of evidence. Plaintiff notes that preclusion of an expert is a "drastic sanction" and unnecessary in this instance. Plaintiff's claims are without merit.

Admission of expert testimony is within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion. *Walsh v. Kubiak*, 661 A.2d 416, 419 (Pa. Super. 1995). Enforcement of procedural rules, whether local or state-wide, is dictated by the facts and circumstances of the individual case. "It has been our policy to overlook...procedural errors when a party has substantially complied with the requirements of the rule and no prejudice

8

would result." *Pomerantz v. Goldstein*, 387 A.2d 1280, 1281 (Pa. 1978). Procedural rules exist to promote efficiency and fairness and should not be given status beyond this inherent power. *Feingold v. Southeastern Pennsylvania Transportation Authority*, 488 A.2d 284, 287 (Pa. Super. 1985).

Pennsylvania Rule of Civil Procedure 212.1 requires that parties submit a pre-trial statement. Pennsylvania Rule of Civil Procedure 212.2(a) provides that a pre-trial statement shall contain:

> (5) a copy of the written report, or answer to written interrogatory consistent with Rule 4003.5, containing the opinion and the basis for the opinion of any person who may be called as an expert witness;

Pa.R.Civ.P. 212.2(a).

Pennsylvania Rule of Civil Procedure 4003.5 provides:

> Rule 4003.5 Discovery of Expert Testimony. Trial Preparation Material.
>
> (b) If the identity of an expert witness is not disclosed in compliance with subdivision (a)(1) of this rule, he shall not be permitted to testify on behalf of the defaulting party at the trial of the action. However, if the failure to disclose the identity of the witness is the result of extenuating circumstances beyond the control of the defaulting party, the court may grant a continuance or other appropriate relief.

Pa.R.Civ.P. 4003.5(b). The court must balance the "facts and circumstances of each case to determine the prejudice to each party" before precluding an expert witness. *Feingold v. SEPTA*, 488 A.2d 284, 287 (Pa. Super. 1985).

In *Feingold*, the Superior Court noted several factors to consider in determining whether to allow the testimony of a witness not disclosed during discovery, including: (1) bad faith on the part of the party seeking to call such witnesses; (2) the party's ability to have discovered the witness earlier; (3) the validity of the excuse offered; (4) the willfulness of the party in failing to comply with the court's order; and (5) the party's intent to mislead or confuse his adversary. 488

9

A.2d 284, 287 (Pa. Super. 1985). Further considerations include: (1) the prejudice or surprise of the party against whom the witness would have testified; (2) the party's ability to cure that prejudice; (3) the extent to which the case would be disrupted by waiver of the rule against calling unlisted witnesses; and (4) the party's bad faith in failing to comply with the court's order. *Id.*

In *Feingold*, the court precluded Appellant's treating physician, Dr. Atkins, from testifying. Appellee, SEPTA, intended to call Dr. Atkins on their own behalf. Because Appellant had listed Dr. Atkins as a witness at the time of the pre-trial conference, had access to the doctor's records, and knew the substance of his testimony, attempts to claim "prejudice" were ruled disingenuous by the Superior Court.

Plaintiff cites *Curran v. Stradley, Ronon, Stevens, & Young* in support of her position that a report submitted just nine (9) days prior to trial does not result in prejudice. 521 A.2d 451, 455 (Pa. Super. 1987). *Curran* is distinguishable from the instant case. In *Curran*, the defendant's previously disclosed expert was unavailable and a replacement was retained shortly prior to trial. *Id.* at 455. Plaintiff's claim of prejudice only extended to ability to cross-examine on background and qualifications. The Court determined that this prejudice could be cured in the time available. *Id.*

Here, Plaintiff failed to identify any experts until shortly before the trial date. Replacing one expert with another a week before trial is certainly different from preparing a case for months under the impression that no expert will testify. Here, Defendants were not afforded the opportunity to obtain a defense liability expert to rebut Plaintiff's expert. Further, Defendants videotaped their medical expert's testimony believing that Plaintiff would not call a medical expert. To proceed without affording Defendants the opportunity to have their medical expert

10

rebut Plaintiff's medical expert would greatly prejudice Defendants. Re-deposing their own medical expert would create an additional expense and permit Plaintiff to cross-examine their expert a second time. Plaintiff, without providing an excuse for her failure, asserts that Defendants would have adequate time to fully prepare for trial and would not be prejudiced. This Court is not persuaded by Plaintiff's suggestion that Defendants accommodate Plaintiff's disregard of established pre-trial rules at Defendants' cost.

Plaintiff failed to identify any experts they planned to call for trial until significantly after the extended deadlines imposed by the Court. Plaintiff's original deadline for all expert witness discovery – July 6, 2015 – was extended to September 7, 2015. Two motions for extraordinary relief and three trial continuances were previously granted in this case. Nearly eight months passed without any indication that Plaintiff would call expert witnesses, which were required in this case, as acknowledged by Plaintiff in her lack of defense against Defendant's motion for nonsuit. As a result, Defendants did not prepare a liability expert to rebut Plaintiff's claims and would be forced to incur more costs to rebut Plaintiff's medical expert. Defendants were surprised and severely prejudiced. Preclusion of Plaintiff's expert witnesses was warranted and not an abuse of discretion by this Court.

## IV.    CONCLUSION

For the reasons provided, Plaintiff's claims are without merit and the ruling of the Court should be affirmed.

By the Court:

_____

ANN M. BUTCHART, J.

11

EXHIBIT A

COURT OF COMMON PLEAS
PHILADELPHIA COUNTY

CYNTHIA VALENTINE,                )
                                  )
        Plaintiff,                )
                                  )
    - vs -                        )   AUGUST TERM, 2014
                                  )       NO. 00927
MARK KINGKINER AND                )
MARTIN ELFANT INC.                )
REAL ESTATE AND J.                )
MALVERN BENJAMIN,                 )
                                  )
        Defendants.               )
- - - - - - - - - - - -           )
CYNTHIA VALENTINE,                )
                                  )
        Plaintiff,                )
                                  )
    - vs -                        )   APRIL TERM, 2014
                                  )       NO. 01727
45 EAST CLIVEDEN                   )
PARTNERS, LP. AND                 )
MARTIN ELFANT INC.                )
REAL ESTATE AND                   )
CLIVEDEN APARTMENTS               )
AND ROBERT ELFANT AND             )
MARTIN ELFANT, INC.               )
REAL ESTATE,                      )
                                  )
        Defendants.               )
- - - - - - - - - - - -



Case ID: 140401727
Control No.: 16063043

Q. And then your heel got caught in a crack?

A. Yes.

Q. And then the doors swung back and hit you?

A. Back and then propelled me down the steps.

Q. The doors hit you in your back?

A. Yes, the door.

Q. And then you fell forward down the steps?

A. Yes, sir.

Q. Do you remember what the weather was like at the time?

A. It was clear.

Q. Is there -- what was the lighting like in this hallway or this area where the fall occurred?

A. It was between 12:00 and 1:00. The sun was shining.

Q. Were there lights on inside, as well?

A. I believe so, yes.

Q. Was it well-lit then?

A. The inside was. The outside was just natural light.

Q. How were you feeling that day before the fall?

A. Optimistic, excited.

Q. Were you in any type of pain?

Case ID: 140401727
Control No.: 16063043

gone through some type of marriage ceremony with Cory Harris, like an Islamic or Muslim marriage ceremony?

A.    Not the traditional type.

Q.    Are you still with Cory Harris?

A.    We are friends.

Q.    Are you planning to marry him at all?

A.    No, I am not.

Q.    Aside from the skinned knee, did you have any other visual signs of injury such as bruising, swelling, any other cuts or scrapes?

A.    Yeah.  I had bruising.

Q.    Where was that?

A.    I had a contusion on my back and I had a couple contusions on my legs.

Q.    On both legs?

A.    I know for a fact my right leg.

Q.    Did you ever take any photographs of the skinned knees or any of your bruises or contusions?

A.    Possibly, yes.

Q.    What do you mean by possibly?  You can't recall or you did?

A.    I've taken a lot of pictures.

Q.    Did some of those pictures include

Case ID: 140401727
Control No.: 16063043

Q.   Did you tear your panty hose?

A.   Yes, I did.

Q.   Did you get changed in any way before going into the interview?

A.   I didn't have time.  My skirt was long enough to kind of hide it.

Q.   Hide the tear?

A.   Yes.

Q.   So then you drove yourself to the interview at the Hospital of Pennsylvania; is that right?

A.   University of Pennsylvania, yes, sir.

Q.   Is that all the way over in West Philadelphia?

A.   Yes, sir.

Q.   Were you late at all?

A.   Was I late?

Q.   Yeah, for the interview.

A.   No, sir, I was not.

Q.   How did the interview go?

A.   The interview went well to me.  My specialty is more in neurology and neurosurgery.  So the heart would be me learning something totally different.  Which I'm a fast learner, it was fine.

But I probably had competition that might

Case ID: 140401727
Control No.: 16063043

something to Mr. K. Because he stayed in and out of my apartment. I know my father did look around.

Q. Did he mention anything to you?

A. He didn't mention anything necessarily to me. But the things that were important, he mentioned to -- like things that were out of regulation and stuff like that because of the job that he had, he wrote, you know, an initial letter. But it wasn't concerning the steps, yet.

Q. What job did he have, Mr. Valentine?

A. He was the director of HUD for over 30 years.

Q. As a result of the fall, what parts of your body did you hurt?

A. I hurt my neck. I hurt my low back. My hips are out of place.

Q. Both hips?

A. Yes. Yes, sir. I have bilateral sciatica issues. I'm weak on the right side which has contributed to a lot of right-sided issues. Most of my issues are on the right side, like major issues are on the right side. So my body kind of took a beating on this one and I haven't recovered.

Q. So your neck, your low back, both hips are

Case ID: 140401727
Control No.: 16063043

out of place, bilateral sciatica issues, weakness on the right side?

A.    Weakness on the right side, I have sacroiliitis.

Q.    What is sacroiliitis?

A.    It's like the hip joint bone and it's inflamed.  So that's not helping with the numbness on my right side.

Q.    You said most of the major issues are on your right side.  What major issues are you talking about?

A.    Just the numbness, now I have knee fissures.

Q.    What's a knee fissure?

A.    They're like little cuts in my knee that for my age shouldn't even be there, yet.

Q.    You relate those to the fall?

A.    Yes.  Okay.  My knee moves out of place.  I have to wear a brace.

THE WITNESS:  Can I?

MR. DALY:  Yes.

THE WITNESS:  This is the knee stabilizer I got from orthopedics.

MR. TENTOFF:  Do you mind if I

Case ID: 140401727
Control No.: 16063043

take a photograph of that.

THE WITNESS: Of course, no.

MR. DALY: No problem.

THE WITNESS: I'm supposed to wear this every day to try to keep my knee in place.

BY MR. TENTOFF:

Q. For the record, this is for your right knee?

A. Yes, sir.

Q. And it is a Hely leather, H-E-L-Y, essentially, a neoprene brace with almost a rubber insert.

MR. DALY: I don't think it -- yeah. It appears to be rubber. And I'll just say for the record, it's a horseshoe or U-shaped rubber insert/attachment.

BY MR. TENTOFF:

Q. When did you first start -- when did you first notice that you were in pain?

A. Two days after I fell.

Q. Did you have any pain before the two days after you fell?

A. No, sir. I was ready to go back to work.

Case ID: 140401727
Control No.: 16063043

I liked to work.

Q.      Where did you first start experiencing pain?

A.      I first started experiencing it in my back.

Q.      Your low back?

A.      My low back going down my buttocks going down my legs.  And that's when I rushed to the emergency room because I knew something wasn't right.  All they could do is x-rays.  So I was sent to PCP, Dr. Lazowick.

Q.      When you say PCP, you mean primary care physician?

A.      I'm sorry.

Q.      It's okay.

A.      Primary care physician and he sent me immediately for MRI.  And that's where MRI showed a couple of damages that weren't there previously.

Because I had had so many MRIs done and x-rays and things had dramatically changed.  I didn't have bulges.  I didn't have a lot of stuff that was on my MRI.

Q.      When did you first start experiencing the neck pain?

A.      The neck pain was a couple weeks later.

Case ID: 140401727
Control No.: 16063043

Q.    A couple weeks after the fall?

A.    Yes, maybe like a week and a half, two weeks.

Q.    The knee fissures, when did you start experiencing that?

A.    I didn't know.  I was actually in aqua therapy.  And the next day, I couldn't put any weight on my foot on my right side.

They thought it was a torn meniscus.  And it was a little bit more than what we expected.

Q.    For the knee fissures, only in your right knee?

A.    Yes.

Q.    The hips being out of place, when did you start experiencing that?

A.    When Dr. Chan did my valve, she told me that my hips were out of -- like I'm not right.

Q.    Is that Dr. Charmaine Chan?

A.    Yes.  Yes, sir.

Q.    Do you remember when that was, how long after the incident that was?

A.    It was over a year and a half.  And she experienced my spasm.

Q.    What do you mean she experienced it?

Case ID: 140401727
Control No.: 16063043

A.    She could see the spasms going up and down my body.

Q.    Where were the spasms?

A.    They were in my back.  They jumped all the way to my feet.  My feet would curl like the wicked witch of the west.

       (At this time, a discussion was held off the record.)

       THE WITNESS:  So the doctor saw that and she actually had to kneed the spasm out.  And that's when she realized I have severe radiculopathy throughout my body.

       And that's when she started sending me to specialists.  I prefer females due to my religious beliefs.  But a lot of people in the orthopedic field or the back field are predominantly male.  I know this because I've worked in that setting.  So I tried to find a female.  I was -- I just --

BY MR. TENTOFF:

Q.    When did you convert to Islam?

A.    I always dabbled in it as a teen.  But

Case ID: 140401727
Control No.: 16063043

A.      April of 2014, April, May.

Q.      So like two years after this fall?

A.      Yes, sir.

Q.      Was that the first time you had a spasm or is that the first time she saw them?

A.      No.   That was the first time she saw them. That was another reason why I was put on alprazolam was to try to control my spasms because they were so bad.

Q.      The right-sided weakness, when did you start developing that?

A.      A few months into my injury.

Q.      So a few months after the fall?

A.      Yes, sir.

Q.      Had you ever had right-sided weakness before this incident?

A.      No, sir.

Q.      Had you ever complained of right-sided weakness to any medical provider before this incident?

A.      No, sir.

Q.      The sciatica that you experienced, how long after the fall did you begin experiencing that?

A.      Within a month.

CERTIFICATE

I, CAROL NEALIS, Court Reporter, certify that the foregoing is a true and accurate transcript of the foregoing deposition, that the witness was first sworn by me at the time, place and on the date herein before set forth.

I further certify that I am neither attorney nor counsel for, not related to nor employed by any of the parties to the action in which this deposition was taken; further, that I am not a relative or employee of any attorney or counsel employed in this case, nor am I financially interested in this action.

_Carol Nealis_
_____
Carol Nealis
Notary Public # 1261298
County of Philadelphia
My commission expires
3/22/2019

# EXHIBIT B

**Mark D. Allen, M.D.**
Orthopedic Surgeon



**ALLIED MEDICAL ASSOCIATES**

Northeast Phila.
8110-12 Roosevelt Blvd.
Phila., PA 19152

Bala Cynwyd
333 E. City Ave.
Suite PE-18
Bala Cynwyd, PA 19004

Germantown
228 W. Chelten Ave.
1st Floor - Rear
Phila., PA 19144

Lansdowne
318 N. Lansdowne Ave.
Lansdowne, PA 19050

Temple Univ.- Episcopal Hosp.
Medical Arts Bldg.
100 E. Lehigh Ave., Suite 302
Philadelphia, PA 19125

**NAME: VALENTINE, CYNTHIA**
**CHART NO.: VALCY200**
**D/A: 04/20/2012**

**EXAMINATION DATE: 06/02/2016**

### ORTHOPEDIC CONSULTATION

The patient present today for examination and consultation.

**HISTORY OF PRESENT ILLNESS:**

The patient states that she was well until April 20, 2012, when sustained multiple injuries as a result of a fall at an apartment complex. She reports that her heel got caught in the crack of a step and caused her to fall down stairs again, sustaining multiple injuries.

The patient states that following the accident, she was treated and released from Lankenau Hospital. She states that she been treated with her primary care physician. She also reports to coming under the care of Dr. McCoy. She states that she is now presently treating with pain management.

**CURRENT COMPLAINTS:**

The patient presents today and states that she continues to experience neck pain, mid back pain, and lower back pain. She also reports to experiencing numbness and tingling in both arms and both legs right worse than left.

**PAST MEDICAL HISTORY:** Remarkable for asthma, and minor sprains as a result of a motor vehicle accident and work injury on 2006 with no residuals.

**FAMILY HISTORY:** Non-contributory as the patient reports to being adopted.

**SOCIAL HISTORY:** The patient states that she is presently single. She states that she is a medical assistant but has been out of work since the time of the accident. She denies use of tobacco or alcohol.

Case ID: 140404727272
Control No.: 16063043

**ALLERGIES:** NKDA.

**RECORDS REVIEWED:**

Lankenau Hospital
      Extensive records dating back to 2002
      Lab reports and operative reports
      Emergency Department notes of 2/21/2005
Riddle Memorial Hospital
Main Line Health
Lankenau Radiology
Jefferson Neurosurgical Associates
Germantown Medical Associates
Ches-Penn Family Health
CVS Pharmacy
NovaCare Rehabilitation
Wal-Greens
Parkside Family Medicine
Daniel Lazowick, D.O.
Glenn Rosen, M.D.
Thomas Jefferson University Hospital
Albert Einstein Medical Center

**STUDIES:**

MRI Lumbar spine 4/14/2007, Normal.

MRI Lumbar spine 9/21/2009 – Normal.

MRI Lumbar spine 4/26/2012, Broad based disc bulge L4-5.

MRI Lumbar spine 1/10/2013, Disc bulge L4-5, very mild degeneration.

MRI Lumbar spine 5/2/2014, Mild facet degeneration.

MRI Cervical spine Disc bulge C4/5, C5/6. Facet hypertrophy.

## PHYSICAL EXAMINATION

35 year old right-hand dominant African American female.
Height 5 feet 4 inches.
Weight 200 pounds.

The patient ambulates with a cane.

Examination of the cervical spine reveals spasm and tenderness from occiput through C7 bilaterally. Range of motion of the cervical spine is restricted and pain productive in all planes. Trigger points noted along the superior border of the bilateral trapezius muscles.

Examination of the thoracic spine reveals a normal kyphosis. Tenderness noted along the paraspinal musculature from T5 throughT9 bilaterally.

Examination of the lumbar spine remove spasm and muscle guarding with tenderness to palpation from L2 through L5 - S1 bilaterally. Range of motion of the lumbar spine is restricted and pain productive in all planes to approximately 60% of normal. Straight leg raises limited to 60 degrees bilaterally.

Neurological examination reveals thumb to index finger pinch test weakness on the right, and EHL weakness on the left.

### IMPRESSIONS:
- Chronic post-traumatic sprain cervical spine
- Cervical disc bulge C4/5, C5/6.
- Chronic post-traumatic sprain thoracic spine
- Chronic post-traumatic sprain lumbar spine
- Lumbar disc bulge L4/5.
- Cervical radiculopathy
- Lumbar radiculopathy
- S/p Lumbar injections x3

It is my opinion, within a reasonable degree of medical certainty, that these conditions are a direct result of the accident which occurred on April 20, 2012. Furthermore, it is my opinion that these injuries are serious and severe in nature and have created a permanent partial disability with significant loss of function of the cervical and lumbar spine and the affected nerve roots.

RECOMMENDATIONS:
1. Continue to follow up with pain management.
2. Discussed the option of additional lumbar spinal injections and or cervical spinal injections.
3. Return as needed or if she elects to proceed with the options noted above.

DISCUSSION:

I have had the opportunity to review the report of Dr. Brody. It should be noted that Dr. Brody's report is based on a review of records only, without benefit of direct patient history or examination of the patient.

It is acknowledged, that the patient had prior history of back complaints. However, the two MRI lumbar spine results prior to the events of April 20, 2012, were normal. Additionally, the patient states that she was symptom-free and functioning and working without pain or restriction prior to April 20, 2012.

Therefore, I respectfully disagree with Dr. Brody, as it remains my opinion that the events of April 20, 2012, are directly responsible for Ms. Valentine's current conditions.

PROGNOSIS:

Based on my review of the available records and my history and examination today it is my opinion that the patient's current conditions are a direct result of the events of April 20, 2012. I have advised the patient that her cervical and lumbar disc conditions, are considered permanent injuries. I have also advised the patient that in my opinion, she will most likely continue to experience her current level of pain and restriction on a chronic basis.

If you have any questions or require any additional information regarding the care treatment of this patient, please do not hesitate to contact this office.

Sincerely,


MARK D. T. ALLEN, M.D.
ORTHOPEDIC SURGEON
Diplomate, American Academy of Neurological and Orthopedic Surgeons
MDTA/DBM
Dictated/Transcribed, Not Read