963 A.2d 1282

**Jack HALPER and Marlene Halper, h/w,
and David Halper, Appellants**

**v.**

**JEWISH FAMILY & CHILDREN'S SERVICE OF GREATER
PHILADELPHIA, Appellees (Two Cases).**

Supreme Court of Pennsylvania.

Argued Oct. 15, 2007.

Decided Feb. 19, 2009.

Edward H. Rubenstone, Lamm Rubenstone, LLC, Trevose; Samuel C. Tataro, Mellon, Webster & Shelly, P.C., Doylestown, for Jack Halper and Marlene Halper, h/w, and David Halper, appellants.

Naomi A.P. O'Neill, for Jewish Family & Children's Service of Greater Philadelphia, appellees.

BEFORE: CAPPY, C.J., CASTILLE, SAYLOR, EAKIN, BAER, BALDWIN and FITZGERALD, JJ.

## *OPINION*

Justice EAKIN.

Jack and Marlene Halper adopted their son, David, in 1964 through Jewish Family and Children's Service of Greater Philadelphia. David's life has been riddled with mental health problems, treatment, suicide attempts, continuous drug abuse, and poor social relationships. In 1979, David was hospitalized for depression, drug dependence, and adolescent adjustment reaction following a suicide attempt. From 1980 through 1999, the Halpers and David sought his birth mother's medical records to facilitate treatment and insight into David's problems.

The Agency had a file on David's birth mother, which included a psychiatrist's letter indicating she suffered from undifferentiated schizophrenia. That letter was not in David's file; apparently it had been placed in the file of David's younger sibling, who was also placed for adoption through the Agency. It was not produced for the plaintiffs until 1999.

The Halpers [1] brought an action against the Agency alleging two theories of negligence. First, the Halpers alleged "wrongful adoption," *i.e.*, the Agency improperly failed to notify them of David's birth mother's mental history. Second,

1. Jack Halper died prior to trial.

the Halpers asserted the Agency negligently misfiled the birth mother's medical information, so that when they later sought such information, it was not available; as a result, David did not receive the psychiatric care he might have otherwise received. David brought his own action, which mirrored the claims in the Halpers' second "failure to disclose" theory.

The jury returned a general verdict finding the Agency negligent; the jury was not asked to differentiate between the "wrongful adoption" and "failure to disclose" theories. The jury awarded the Halpers $225,000 and David $75,000. The Halpers and the Agency appealed.

On appeal, the Superior Court found the verdict "too muddled to be legally supported." *Halper v. Jewish Family and Children's Service of Greater Philadelphia,* No. 2476 EDA 2004, 2005 WL 3417271 and No. 2517 EDA 2004, unpublished memorandum at 4, 2005 WL 3417273 (Pa.Super. filed September 6, 2005). It found the Halpers presented conflicting expert testimony regarding whether David was properly diagnosed as schizophrenic, or major depressive with psychotic features. *Id.,* at 5–6. However, relying on *Brannan v. Lankenau Hospital,* 490 Pa. 588, 417 A.2d 196 (1980), the Superior Court embraced the Agency's argument that at the time of the adoption, schizophrenia was believed to be a reactive disorder of the mind, not as an inherited or foreseeable condition; thus, it would not have been negligent to have kept that information from the Halpers. *Id.,* at 6–7 (citing *Gibbs v. Ernst,* 538 Pa. 193, 647 A.2d 882, 891 (1994)). As the verdict sheet did not differentiate between the two theories of negligence offered, the verdict was problematic because David was only able to recover under the second theory of liability, negligent failure to disclose, as opposed to negligent misrepresentation. Therefore, the Superior Court reversed the judgment and remanded for a new trial concerning David's claim, limited to the issue of negligent failure to disclose, *i.e.,* the misfiling of David's birth mother's medical information and the resulting damages. *Id.,* at 8. The court noted all other claims raised were relevant to the issue of wrongful adoption and were rendered moot. *Id.,*

at 10. For reasons unstated, the remand was limited to David's claim alone.

Justice Montemuro dissented, finding the expert testimony was not so contradictory that the jury was left with no guidance regarding the nature of David's mental illness. *Halper v. Jewish Family and Children's Service of Greater Philadelphia*, No. 2476 EDA 2004, 2005 WL 3417271 and No. 2517 EDA 2004, unpublished memorandum at 2, 2005 WL 3417273 (Pa.Super. filed September 6, 2005) (Montemuro, J., dissenting). The dissent stated the testimony can be reconciled as there are two complimentary explanations for the variant diagnoses. First, the ingestion of medication could affect diagnoses, and second, David was difficult to diagnose because many major psychiatric disorders are "co-morbid," disorders that occur together. *Id.*, at 2–3. Furthermore, Justice Montemuro opined that under *Gibbs*, failure to disclose applies in the adoption context; thus, the Halpers were under no obligation to show it was foreseeable that David's birth mother's mental health problems might negatively impact David in order to establish the Agency had a duty to disclose information regarding her mental illness. *Id.*, at 3–4. The Halpers and David appealed.

We granted allowance of appeal to determine:

1. Whether the Superior Court erred in its interpretation and application of *Gibbs v. Ernst*, 538 Pa. 193, 647 A.2d 882 (1994) in this appeal.

2. Whether the Superior Court erred in its interpretation and application of *Brannan v. Lankenau Hospital*, 490 Pa. 588, 417 A.2d 196 (1980) in this appeal.

3. Whether the Superior Court erred in failing to remand Jack and Marlene Halper's claim for failure to timely produce the medical history of the adoptee's birthmother for a new trial.

4. Whether the Superior Court erred in concluding that there was an absence of evidence to establish that Jack and Marlene Halper would not have adopted David Halper had they known of the birthmother's mental health.

*Halper v. Jewish Family and Children's Service of Greater Philadelphia*, 591 Pa. 399, 919 A.2d 184 (2007). "Although all new trial orders are subject to appellate review, it is well-established law that, absent a clear abuse of discretion by the trial court, appellate courts must not interfere with the trial court's authority to grant or deny a new trial." *Harman ex rel. Harman v. Borah*, 562 Pa. 455, 756 A.2d 1116, 1121–22 (2000) (citations omitted). We are faced with questions of law, which are subject to *de novo* review, and our scope of review is plenary. *In re Milton Hershey School*, 590 Pa. 35, 911 A.2d 1258, 1261 (2006).

The Halpers first argue they were under no obligation to show the foreseeability of David's birth mother's mental illness in order to establish the Agency had a duty to disclose the information concerning her condition. They also assert the Superior Court majority erred in its interpretation and application of this Court's decision in *Gibbs* in holding the duty of adoption agencies with regard to negligent misrepresentation is only applicable where the condition of the child was foreseeable at the time of placement. The Halpers agree with the dissent, which discussed the Agency's duty to fully disclose all non-identifying information about a child without attaching a foreseeability element.

The Agency counters the Superior Court correctly interpreted *Gibbs* in determining the foreseeability element is required in the context of both negligent misrepresentation and negligent failure to disclose. Additionally, the Agency argues *Gibbs* only required disclosure of relevant information, and in 1964, David's birth mother's mental health condition was considered a product of her environment and not genetic; thus, such information was irrelevant and was not required to be disclosed.

The issue in *Gibbs* was whether the Commonwealth recognized causes of action such as wrongful adoption and negligent placement of adoptive child. *Gibbs*, at 884. *Gibbs* likened wrongful adoption to the common law tort of negligent misrepresentation, which contains the following elements:

(1) a misrepresentation of a material fact; (2) the representor must either know of the misrepresentation, must make the misrepresentation without knowledge as to its truth or falsity or must make the representation under circumstances in which he ought to have known of its falsity; (3) the representor must intend the representation to induce another to act on it; and (4) injury must result to the party acting in justifiable reliance on the misrepresentation.

*Id.*, at 890 (citing W. Page Keaton, *Prosser and Keaton on the Law of Torts* § 107, at 745–58 (5th ed. 1984)). *Gibbs* held negligent misrepresentation was applicable in the adoption context, and requires agencies to make reasonable efforts to make true representations to prospective parents. *Id.*, at 890–91. *Gibbs* specifically noted negligent misrepresentation is aptly restricted by "the common law notion of foreseeability as found in the concepts of duty and proximate cause to prevent it from becoming in any way a guarantee or warranty of a child's future health." *Id.*, at 891. "Accordingly, under the traditional principles of negligence, the duty of adoption agencies for the purposes of negligent misrepresentation will only apply where the condition of the child was foreseeable at the time of placement so that the agency is blameworthy in making a misrepresentation." *Id.*, at 892 (citation omitted).

*Gibbs* also noted negligent failure to disclose relevant information is equally applicable in the adoption context; however, in this regard *Gibbs* held "an adoption agency has a duty to disclose fully and accurately to the adopting parents all relevant non-identifying information in its possession concerning the adoptee." *Id.* *Gibbs* noted the Adoption Act specifically provided confidential or privileged information must be released after identifying information concerning the biological parents has been removed. *Id.*; *see also* 23 Pa.C.S. § 2102.

Here, the Superior Court was correct in its interpretation of *Gibbs* with regard to negligent misrepresentation, the wrongful adoption claim. As the court noted, "when this adoption took place, schizophrenia was considered to be a product of environment, not an actual disorder of the mind." *Halper*, at 6. Although there was some research in the early

1960s concerning a genetic component in affiliation with schizophrenia, it was the commonly held belief in the medical community that such a disorder was the product of environment. *See* N.T. Trial, 2/24/04, at 178–81. Because of this belief, the court agreed there was no foreseeable harm at the time of the adoption relating to David's birth mother's condition; therefore, even if the information should have been released to the Halpers, failing to provide such information was tempered by the lack of foreseeable harm. *Halper*, at 6–7. Because negligent misrepresentation requires a foreseeability element, as held in *Gibbs*, the Superior Court's analysis was correct.

██   The Halpers next assert the Superior Court majority erred in holding their medical experts were so contradictory they left the jury with no guidance; rather, they contend, each expert's testimony was easily reconciled with the others and should be deemed consistent, under the circumstances. The Agency counters that the Superior Court's interpretation of *Brannan* was correct; it suggests the Halpers' experts blatantly disagreed on whether David suffers from schizophrenia, the fundamental issue in the case.

*Brannan* was a medical malpractice case involving an expert witness, Dr. Thompson. Dr. Thompson testified at trial that both of the plaintiff's treating physicians acted negligently in their failure to timely administer certain drugs. *Brannan*, at 200. On re-direct, Dr. Thompson indicated he could not answer whether the treating physicians' conduct fell below the applicable standard of care; when asked the same question later, he reaffirmed the conduct of the physicians was below the applicable standard. *Id. Brannan* held this was a minor divergence and allowed the issue to go to the jury. *Id.* The Court noted, "[A] plaintiff's case will fail when the testimony of his two expert witnesses is so contradictory that the jury is left with no guidance on the issue." *Id.* (citing *Mudano v. Philadelphia Rapid Transit Co.*, 289 Pa. 51, 137 A. 104, 108 (1927) (plaintiff's experts must "so vitally disagree on essential points as to neutralize each other's opinion evidence. . . .")).

This Court has allowed juries to hear relevant evidence and resolve conflicts among expert witnesses. *See Morrissey v. Commonwealth, Dept. of Highways,* 440 Pa. 71, 269 A.2d 866, 868 (1970); *Abrams v. Philadelphia Suburban Transp. Co.,* 438 Pa. 115, 264 A.2d 702, 704 (1970). Only expert testimony containing absolute conflicts on fundamental issues will be deemed fatal; otherwise, evidence will be legally competent and fit for submission to the jury. *See Menarde v. Philadelphia Trasp. Co.,* 376 Pa. 497, 103 A.2d 681, 685 (1954).

Here, the Superior Court's only real analysis of this issue was its distinguishing the facts of this case from *Simmons v. Mullen,* 231 Pa.Super. 199, 331 A.2d 892 (1974). There, one expert was unable to pinpoint a medical problem, so the testimony was supplemented with another expert who made the exact diagnosis. *See Halper,* at 5. The Halpers and David provided the testimony of three experts, Raquel Gur, M.D., Ph.D., a psychiatrist and neurologist; Dennis Rockwell, Ph.D., a psychologist; and Anthony Yacona, M.D., a psychiatrist. Dr. Rockwell began treating David in 1999, and Dr. Yacona began treating David upon Dr. Rockwell's referral in 2000. N.T. Trial, 2/25/04, at 106, 164.

Dr. Gur never treated David, but examined him and spoke to Mrs. Halper on July 29, 2003, in preparation for trial. N.T. Trial, 2/24/04, at 107–08. Based on the one meeting with David and Mrs. Halper, and speaking over the phone with David's two treating doctors, Dr. Gur testified David suffers from major depression with psychotic features and substance abuse. *Id.,* at 124. Dr. Gur also testified it is often difficult to pinpoint a particular disorder, especially where major psychiatric disorders are concerned because they are often co-morbid. *Id.,* at 122. Many times substance abuse co-exists with depression or schizophrenia, and the co-morbid nature of these disorders can affect a disease process and obscure a clinical picture. *Id.,* at 122–23. She also testified the fact David was on three medications, an antipsychotic, one for mood, and one for anxiety, *id.,* at 118, could have affected her diagnosis, *id.,* at 120; however, she did not want to take David

off the medications to examine him because he was a suicide risk. *Id.*, at 121.

Dr. Rockwell testified David is severely mentally ill, and believes David suffers from schizophrenia. N.T. Trial, 2/25/04, at 135–36. Although Dr. Rockwell testified David suffers from schizophrenia, he also testified he has depression with psychotic features and ultimately diagnosed David with schizophrenia because of his constantly diminishing condition. *Id.*, at 146, 150–51. Dr. Rockwell also testified the fact David was on various drugs at the time Dr. Gur examined him likely explained the difference in their diagnoses. *Id.*, at 160. Dr. Yacona testified based on how ill David is and his psychopathology, he suffers from chronic undifferentiated schizophrenia. *Id.*, at 173. Regarding Dr. Gur's testimony, Dr. Yacona admitted a difference in understanding David's condition, but stated psychiatrists do not agree, in general, and different understanding of human beings includes different ways of psychiatrically describing them. *Id.*, at 200–01.

Thus, two of the experts, David's treating physicians, testified David suffers from schizophrenia, while Dr. Gur, who met with David on one occasion while he was medicated, diagnosed him with major depression with psychotic features and substance abuse. In viewing their complete testimony, the experts were in agreement regarding David's past behaviors, suicide attempts, substance abuse, and overall scheme of mental illness. Those similarities suggest the difference in diagnosis was not fatal and was fit for jury submission. In fact, it is similar to the difference noted in *Brannan*. Even though the ultimate diagnoses were different, those differences did not sufficiently compromise the expert testimony to remove the issue from the jury's consideration, and we believe the Superior Court erred in its interpretation and application of *Brannan*. The trial court was correct in finding this to be a matter for the jury to decide, because sufficient testimony was taken to allow such a determination, and the evidence was not so contrary as to be fatal. *See* N.T. Trial, 3/2/04, at 60–61.

■ The Halpers assert the Superior Court erred in failing to address their claim for failure to timely produce the medical history of David's birth mother when it remanded for a new trial solely on David's identical claim. Relying on *Connelly Containers, Inc. v. The Pennsylvania Railroad*, 222 Pa.Super. 7, 292 A.2d 528 (1972), the Halpers assert no special verdict form was requested; thus, the verdict should stand because only one of the two theories of negligence was undermined. *Id.*, at 532–33; *see* Appellants' Brief, at 21. This case had two plaintiffs, parents and child; the parents had two theories of negligence, with the child sharing the second theory only. As concerns David, remand was ordered because of perceived problems with the expert witnesses. We reject those problems, and agree with Justice Montemuro—any discrepancy was minor and the matter was properly given to the jury. As such, the verdict as to David is entirely proper—there is no reason to remand.

As to the parents, however, we have found their first theory of negligence untenable for the reasons above. As with David's claim, their second theory was supported by the evidence, and it is unclear why the Superior Court failed to also remand as to their second theory of liability. That said, the verdict slip did not differentiate between the two theories, and no special verdict slip was requested; we cannot tell if the award to the parents was based on their first theory or their second. If the award was based solely on the first theory, it cannot stand. If based solely on the second theory, it is proper.

Some of our sister states have adopted the "general-verdict rule." [2] This rule states "when the jury returns a general

---

**2.** *See generally McCord v. Maguire*, 873 F.2d 1271, 1274 (9th Cir.1989); *Adkins v. Ford Motor Co.*, 446 F.2d 1105, 1108 (6th Cir.1971); *Auto. Acceptance Corp. v. Powell*, 45 Ala.App. 596, 234 So.2d 593, 600 (Ct.Civ.App.1970); *White v. Jackson* 36 Ala.App. 643, 62 So.2d 477, 477–78 (1953); *Reese v. Cradit*, 12 Ariz.App. 233, 469 P.2d 467, 472 (1970); *Cont'l Dairy Equip. Co. v. Lawrence*, 17 Cal.App.3d 378, 94 Cal.Rptr. 887, 890 (1971); *Dowling v. Finley Assocs., Inc.*, 248 Conn. 364, 727 A.2d 1245, 1249 (1999); *Robinson v. Washington Internal Med. Assocs., P.C.*, 647 A.2d 1140, 1145 (D.C.1994); *Nimetz v. Cappadona*, 596 A.2d 603, 608 (D.C.1991); *Barth v. Khubani*, 748 So.2d 260, 261

verdict involving two or more issues and its verdict is supported as to at least one issue, the verdict will not be reversed on appeal." *See Dropkin,* at 810 (citing *Todd v. South Carolina Farm Bureau Mut. Ins. Co.,* 287 S.C. 190, 336 S.E.2d 472, 473–74 (1985)). "[A] defendant who fails to request a special verdict form in a civil case will be barred on appeal from complaining that the jury may have relied on a factual theory unsupported by the evidence when there was sufficient evidence to support another theory properly before the jury." *Nimetz,* at 608.

Here, the jury awarded the Halpers $225,000 and David $75,000. At trial, neither the Agency nor the Halpers requested a special verdict slip or interrogatories to determine on what issues the jury awarded damages. Clearly there is a discrepancy in the amount of damages awarded; however, because a general verdict was returned and the evidence supported one of the Halpers' theories, the verdict must stand. Therefore, we adopt and apply the "general-verdict rule" here because we will not shift the burden to the Halpers due to the Agency's failure to request a special verdict slip, and the evidence was clearly sufficient to support at least one of the Halpers' two theories of liability.

Finally, the Halpers argue the Superior Court erred in concluding there was insufficient evidence presented that they would not have adopted David had they known of his birth

(Fla.1999); *Strino v. Premier Healthcare Assocs., P.C.,* 365 Ill.App.3d 895, 302 Ill.Dec. 784, 850 N.E.2d 221, 229–30 (2006); *Estate of Lawler v. Weston,* 451 So.2d 739, 743 (Miss.1984); *Lahm v. Burlington Northern R. Co.,* 6 Neb.App. 182, 571 N.W.2d 126, 131–32 (1997); *Skender v. Brunsonbuilt Const. and Dev. Co., LLC,* 122 Nev. 1430, 148 P.3d 710, 717 (2006); *Wagner v. Roche Labs.,* 85 Ohio St.3d 457, 709 N.E.2d 162, 165 (1999); *Shoup v. Wal–Mart Stores, Inc.,* 335 Or. 164, 61 P.3d 928, 931–32 (2003); *Heroux v. Heroux,* 58 R.I. 79, 191 A. 265, 267 (1937); *Dropkin v. Beachwalk Villas Condo. Assoc., Inc.,* 373 S.C. 360, 644 S.E.2d 808, 810–11 (Ct.App.2007); *Martinmaas v. Engelmann,* 612 N.W.2d 600, 615 (S.D.2000); *Barson By and Through Barson v. E.R. Squibb & Sons, Inc.,* 682 P.2d 832, 835 (Utah 1984); *Orr v. Crowder,* 173 W.Va. 335, 315 S.E.2d 593, 607 (1983). *But cf. Cavallero v. Travelers Ins. Co. of Hartford, Conn.,* 197 Minn. 417, 267 N.W. 370, 373 (1936); *Welch v. Gonic Realty Trust Co.,* 128 N.H. 532, 517 A.2d 808, 810 (1986); *State v. N.I.,* 349 N.J.Super. 299, 793 A.2d 760, 772 (App.Div.2002).

mother's condition. More specifically, the court held, "[w]e cannot find in [Mrs. Halper's] testimony any statement that she would not have adopted the child had she known the birth mother's condition. Thus, there is no evidence supporting this claim." *Halper*, at 7 n. 5. This issue is applicable only to the Halpers' first theory of negligence, wrongful adoption, and because we affirm the Superior Court's ruling on that matter, this issue does not warrant our review.[3]

We reverse the decision of the Superior Court. The verdict as to the Halpers and David is reinstated. Jurisdiction relinquished.

Former Chief Justice CAPPY and former Justices BALDWIN and FITZGERALD did not participate in the decision of this case.

Chief Justice CASTILLE and Justice BAER join the opinion.

Justice SAYLOR files a concurring opinion.

Justice SAYLOR, concurring.

I join the majority opinion, subject to the following observations.

In *Gibbs v. Ernst*, 538 Pa. 193, 647 A.2d 882 (1994), this Court recognized the validity of a cause of action for negligent failure to disclose pertinent information on the part of an adoption agency, in the context of the initial adoption.[1] The present holding extends the scope of that cause of action to include the post-adoptive timeframe, at least under the facts of this case. In my view, after an adoption has occurred, the

**3.** Although we affirm the Superior Court on this point, there is such testimony in the record. Mrs. Halper testified several times she would never have adopted David had she received David's birth mother's medical information at the time. N.T. Trial, 2/23/04, at 140–41.

**1.** Although Appellee argues that *Gibbs* interpreted a later adoption act than the one in effect at the time of the present adoption, the recognition of the duty to disclose was not based solely on the statute; it was predicated on the inherent nature of the relationship between the agency and the adoptive parents. *See id.* at 214–15, 647 A.2d at 892–93.

dynamics of the agency/adoptive-parent relationship differ somewhat from those obtaining in the pre-adoptive period, as the adoptive parents have already made and finalized their decision, the duration of the post-adoptive timeframe is much longer, and different legislative directives may apply. Thus, I would not find that *Gibbs* authorizes a negligent-failure-to-disclose claim in all post-adoptive situations.

Under the present facts, however, I am comfortable with the outcome for several reasons. First, the agency negligently failed to locate information about the birth mother's medical history that it had in its possession when specific requests for such information were made in the post-adoptive timeframe.[2] Second, by the time such requests were made, the genetic basis for the mother's mental illness was recognized in the medical community, thus undermining any contention that *Gibbs'* foreseeability requirement was not met.[3] Finally, it seems evident (at least to me) that, any time a parent whose adopted child is experiencing mental difficulties contacts the adoption agency seeking information about the birth mother's history of mental illness, failure to disclose relevant data that is on file at the agency may result in harm.

2. It appears to have been assumed at the common pleas level that the Agency had a continuing duty to maintain indefinitely records of the type that it misplaced. As this supposition is not contradicted by the Agency, the issue is not before the Court; thus, I do not understand today's holding to reflect the proposition that such a duty necessarily exists relative to all children whose adoption the agency has facilitated.

3. The first post-adoptive request for information was made in 1980, and even the Agency effectively concedes that, by that time, a genetic predisposition relative to the disorder was widely recognized. For example, on cross-examination of one of the plaintiff's expert witnesses, counsel for the Agency elicited that a major study suggesting such a genetic component had been published in 1967, thirteen years before the first request for information. *See* N.T. Feb. 23, 2004 at 177–78; RR. at 104a. Additionally, in its brief to this Court, the Agency only contends that the prevailing view that such illnesses were caused by environmental factors persisted throughout the 1960s and into the 1970s, *see* Brief for Appellee at 5 n. 2, but not the 1980s. *See also* N.T. Feb. 23, 2004 at 184; RR. at 105a (eliciting that, by 1980 at least nine major psychiatric studies had shown a substantially greater risk for schizophrenia in the close relatives of persons with schizophrenia than in the population at large).