**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**


| | | |
|---|---|---|
| BETTY L. SHIFLETT AND CURTIS SHIFLETT, HUSBAND AND WIFE, | : | No. 43 MAP 2018 |
| | : | |
| | : | Appeal from the Order of Superior |
| Appellants | : | Court at No. 2293 EDA 2016 dated |
| | : | November 9, 2017, reconsideration |
| | : | denied January 12, 2018, Vacating the |
| v. | : | Judgment entered July 18, 2016 of the |
| | : | Lehigh County Court of Common |
| | : | Pleas, Civil Division, at No. 2014-C- |
| LEHIGH VALLEY HEALTH NETWORK, | : | 0388 and Remanding for a new trial |
| INC.; AND LEHIGH VALLEY HOSPITAL, | : | |
| | : | ARGUED:  April 9, 2019 |
| Appellees | : | |


**OPINION**


**JUSTICE DONOHUE**                                    **DECIDED:  September 26, 2019**

Betty and Curtis Shiflett sued Lehigh Valley Hospital and Lehigh Valley Health

Network, Inc. (collectively, the "Hospital") for negligence in connection with injuries Betty

suffered while in the hospital for knee surgery.  The jury returned a verdict for the Shifletts,

awarding them $2,391,620 in damages.  The Superior Court ruled that one of the claims

upon which the Shifletts prevailed at trial was time-barred and should not have been

submitted to the jury.  Finding that some portion of the jury's damage award may have

been based upon the time-barred claim, the intermediate appellate court remanded the

case for a new trial on damages.  We conclude that the Superior Court erred in this regard,

as pursuant to the "general-verdict rule" adopted by this Court in *Halper v. Jewish Family*

*& Children's Services*, 963 A.2d 1282 (Pa. 2009), the Hospital waived any entitlement to

a new trial on damages when it failed to request a special interrogatory on the verdict sheet that would have permitted the jury to allocate the damages awarded on each claim.

Betty Shiflett ("Betty") underwent knee surgery at Lehigh Valley Hospital (hereinafter "the Hospital") on April 12, 2012. While recovering in the hospital's post-surgical unit ("PSU"), Betty fell out of bed. Three days after surgery she was transferred to the transitional skills unit ("TSU") for occupational and physical therapy. Shortly after her transfer to the TSU, Betty experienced pain and a clicking sound in her knee. Betty reported these symptoms to nurse Kristina Michels Mahler ("Nurse Mahler"), but Nurse Mahler did not report these complaints to the treating doctor. On April 19, 2012, a physical therapist informed doctors of Betty's complaints about her knee. The doctors determined that Betty had suffered an avulsion fracture of her left tibial tuberocity. Betty then endured two additional surgeries in an attempt to fix her knee, both of which were unsuccessful. Betty has been left with no extensor mechanism in her leg, suffers from chronic pain, and is confined to a wheelchair.

In February 2014, the Shifletts filed a complaint in which they asserted a claim for negligence in connection with Betty's fall in the PSU as well as a claim of loss of consortium. Complaint, 2/7/2014, at 5-7. Therein, the Shifletts alleged that the Hospital's employees were negligent in failing to provide adequate fall protection for Betty in the PSU and that the Hospital failed to oversee adequately its professional staff. *Id.* ¶ 14. According to the Shifletts, but for this negligence, Betty would not have suffered the avulsion fracture and permanent disability. *Id.* The Hospital filed preliminary objections, complaining that the averments were too vague, general and overbroad to discern the nature of the alleged misconduct at issue. In response, the Shifletts filed an amended

complaint, refining their allegations to specify that they were asserting claims against Hospital for both vicarious liability and corporate liability with respect to the negligence associated with the events that occurred in the PSU. *See* Amended Complaint, 3/27/2014, at ¶¶ 22-29, ¶¶ 30-37. The Hospital again objected on the basis that the averments were impermissibly overbroad and vague, s*ee* Preliminary Objections, 4/10/2014, at 5-9, but the trial court did not agree. It overruled the preliminary objections and the case proceeded toward trial.

More than a year later (and more than three years after the events in the Hospital), the Shifletts sought leave to amend their complaint for a second time in light of evidence revealed during discovery. In the proposed amended complaint, the Shifletts sought to add allegations of negligence regarding Nurse Mahler's conduct in the TSU. Specifically, they sought to include allegations that because of Nurse Mahler's failure to report Betty's complaints to the doctors, Betty received multiple rounds of physical therapy that increased the risk of additional injury to her knee and the need for surgery. *See* Proposed Second Amended Complaint, 7/2/2015, at 22. The Hospital opposed the motion, arguing that the proposed amended complaint added a new cause of action that was barred by Pennsylvania's two-year statute of limitations for negligence claims. 42 Pa.C.S. § 5524. The learned trial court disagreed and allowed the amendment.

At trial, the Shifletts offered evidence that on April 12, 2012, Betty underwent left knee revision surgery at the Hospital. N.T., 2/5/2016, at 165-66. Nurse Terri Langham ("Nurse Langham") identified Betty as a fall risk, as she could not stand and was taking medication that caused her to become confused. N.T., 2/3/2016, at 54-62. Early on the morning of April 14, 2012, Betty awoke, thought she was at home, and attempted to get

out of bed. She fell, hitting her left knee. No injury to her knee was immediately diagnosed. Nurse Langham testified that she had seen the Hospital's written fall prevention protocols during her orientation when starting her employment, but had never reviewed them again. N.T., 2/3/2016, at 9-18. Cynthia Balkstra, an expert on nursing practices, testified that the Hospital's fall prevention guidelines were inadequate and Nurse Langham's failure to review them was inappropriate:

> A. The purpose of the guidelines, again, is to make sure that you use them. So the more regular—the more regular use of them, the more discussion about them, the more promotion of them the better because staff—I mean, it's easy—there's lots of things to remember as a nurse, and it's easy for a staff person to forget exactly what is in the guidelines. So the more emphasis, the more reeducation to the guidelines the better.
>
> Q. Is reviewing the guidelines during orientation and not looking at them again, is that an appropriate use of the guidelines in your opinion as a nurse?
>
> A. No.

N.T., 2/3/2016, Dep. Tr. of Cynthia Balkstra at 45–46. Nurse Balkstra further testified that Betty's hospital records indicated that she had a fall risk assessment of six, indicating a "high risk for falling." *Id.* at 49–50. Nurse Balkstra testified that proper fall prevention measures were not utilized and indicated that this failure was a result of a lack of proper training by the Hospital:

> A. My opinion is that the staff were not educated frequently enough on the use of the guidelines, and specifically the use of the guidelines per the risk.
>
> So in other words, the high risk measures, strategies to prevent a fall were not utilized with Ms. Shiflett. And it – from what Ms. Langham's deposition stated, that she really didn't treat[ ] a six any different than she would have treated a two.

> So that's a failure to educate, properly on the use of the guidelines, which you spend a lot of effort putting together. So you definitely want to use them appropriately.
>
> Q. Did you reach a conclusion as to whether or not Lehigh Valley['s] failure to appropriately train its nursing staff how to use fall precautions guidelines increased the risk of [Ms.] Shiflett falling?
>
> A. Yes, in this case it did because with a score of six, more of those high risk measures should have been put into place.

*Id.* at 69–70.

Upon her transfer to the TSU for therapy and rehabilitation, Betty was under the care of Nurse Mahler. Nurse Mahler, although recording Betty's complaints in the nursing notes, failed to report to the doctors that Betty was experiencing increasing levels of pain and a clicking noise in her left knee. N.T., 2/3/2016, at 167-81. On or about April 19, 2012, a previously undiagnosed nondisplaced fracture in her left fibia avulsed (became displaced). Surgery failed to correct the avulsion fracture, leaving Betty in a permanently disabled condition, confined to a wheelchair with chronic pain.[1]

In support of their claims, the Shifletts also called Dr. Robert Erickson as an expert witness. Dr. Erickson testified that based upon his review of Betty's records, she suffered the nondisplaced fracture of her left fibia when she fell from bed on the night of April 14. N.T., 2/5/2016, at 42. He further opined that avulsion fractures do not happen without trauma, that the fall from bed was the only trauma Betty experienced during the relevant time period, and the fall increased the risk that the nondisplaced fracture would avulse.

---

[1] At the close of the Shifflets' case in chief, Appellees moved for a directed verdict as to the claims related to Nurse Mahler's conduct in the TSU, reiterating their position that those claims were time-barred. The trial court denied this motion.

*Id.* at 32-48. According to Dr. Erickson, the stress on the knee resulting from the physical therapy likely caused the avulsion to occur. *Id.* at 63-64.

Dr. Walter Finnigan, an expert called to testify by the Hospital, did not disagree that Betty suffered a nondisplaced fracture in her left knee that avulsed during her time in the TSU, but contended that the fracture occurred during surgery rather than as a result of her fall from the bed. N.T., 2/9/2016, Dep. Tr. of Dr. Walter Finnigan at 132. He further testified that for adults, absent surgical intervention, a nondisplaced fracture will always result in an avulsion fracture. *Id.* at 217 ("And if there's a crack, it can't stay undisplaced… ."). Dr. Prodromas Ververeli, the surgeon who performed surgery on Betty's knee after the avulsion, testified that avulsion fractures only occur after a trauma and that the trauma resulting from Betty's fall increased the risk that she would suffer an avulsion fracture. N.T., 2/9/2016, Dep. Tr. of Dr. Prodromas Ververeli at 24-30.

Betty testified that she is now permanently disabled and suffers from depression as a result. N.T., 2/4/2016, at 106. She indicated that she is embarrassed, as her husband has to care for her, including dressing and bathing her. *Id.* at 106. She has pain "[a]ll the time" and cannot even ride very far as a passenger in an automobile because travelling causes her too much pain. *Id.* The Shifletts' life care planner expert, Nadene Taniguchi, testified about the Shifletts' damages, including Betty's future medical costs. N.T., 2/5/2016, at 124–56.

On February 8, 202016, the day before the case was submitted to the jury, the trial court met with counsel to confirm that the Shifletts' claim for corporate negligence related to the Hospital's alleged failure to train the nurse (Nurse Langham) on duty at the time of

Betty's fall in the PSU.[2] Counsel for the Shifletts confirmed this representation, indicating that the Shifletts were presenting three claims of negligence: two for vicarious liability (relating to the negligence of Nurse Langham in the PSU and of Nurse Mahler in the TSU), and a claim of corporate liability relating to Betty's fall in the PSU. N.T., 2/8/2016, at 115. Later that day, the trial court presented counsel with a draft verdict sheet and advised counsel that she would discuss it with them the next day. The proposed verdict sheet was as follows:

1. Do you find that Nurse Langham of the Lehigh Valley Hospital was negligent?

Yes _____               No ____

If you answered Question 1 "Yes", proceed to Question 2.

If you answered Question 1 "No", proceed to Question 3.

2. Was the negligence of Nurse Langham of the Lehigh Valley Hospital a factual cause of harm to Plaintiff, [Betty]?

_____

[2] During closing argument, the Shifletts' counsel confirmed for the jury that the fifth question related to the Hospital's negligence in connection with Betty's fall while she was in the PSU:

[T]he fifth question is about [the Hospital] itself. So the first question is about Terri Langham. The next question's [sic] about Nurse Michels [Mahler], but the fifth question is was the Hospital negligent? ... [H]ow can it be that we have these policies and procedures in place for the sole purpose of preventing falls that are 75 percent accurate in predicting who's going to fall, how can it be that we only have our nurses look at them once during orientation and never have them do it again. I submit to you that's negligent and that was just as big a cause as anything else.

N.T., 2/9/2016, at 44–45.

Yes ＿＿＿ No ＿＿＿

Please proceed to Question 3.

3. Do you find that Nurse Michels Mahler of the Lehigh Valley Hospital was negligent?

Yes ＿＿＿ No ＿＿＿

If you answered Question 3 "Yes", proceed to Question 4.

If you answered Question 3 "No", proceed to Question 5.

4. Was the negligence of Nurse Michels Mahler of the Lehigh Valley Hospital a factual cause of harm to Plaintiff, [Betty]?

Yes ＿＿＿ No ＿＿＿

Please proceed to Question 5.

5. Do you find that Lehigh Valley Hospital itself was negligent?

Yes ＿＿＿ No ＿＿＿

If you answered Question 5 "Yes", proceed to Question 6.

If you answered Question 5 "No", proceed to the below INSTRUCTIONS.

6. Was the negligence of Lehigh Valley Hospital a factual cause of harm to Plaintiff, [Betty]?

Yes ＿＿＿ No ＿＿＿

Please proceed to the INSTRUCTIONS.

INSTRUCTIONS:

If you answered Question 2, Question 4, or Question 6 "Yes", proceed to Question 7.

If you did not answer Question 2, Question 4, or Question 6 "Yes", the Plaintiff cannot recover and you should not answer any further questions. Sign the verdict slip and return to the courtroom.

7.       What is the amount of damages sustained by Plaintiff, [Betty], as a result of the negligence of the health-care providers?

Past noneconomic loss in lump sum:
[]
Future medical and other related expenses by year:

Future noneconomic loss in a lump sum:

Loss of a spouse's services, society and consortium:

Verdict Sheet at 1-3. The next morning, the trial court and counsel met to discuss the proposed verdict sheet. The trial court and counsel discussed the special interrogatories regarding the separate claims of negligence relating to Nurse Langham and Nurse Mahler. N.T., 2/9/2016, at 4-6. The trial court then asked, "So you're otherwise okay with everything here?" *Id.* at 6. Neither counsel voiced any objections. *Id.* The trial court gave the agreed upon charge to the jury and the verdict sheet was provided to the jury without modification.

The jury returned a verdict for the Shifletts. It answered "no" to the first question and "yes" to the third, fourth, fifth and sixth questions. With respect to the seventh question, the jury awarded total damages of $2,391,620.[3] The Hospital asked that the jury be polled, at which time the trial judge advised counsel that "we'll do it with each question; but when it gets to the economic damages, I'm not going to ask them for each

_____

[3]   The jury awarded $800,000 in past noneconomic damages, $500,000 in future noneconomic damages, and $300,000 for loss of consortium claim. The balance was awarded for future medical expenses. Verdict Sheet at 3.

line.  I'm just going to say if they agree with the damages." *Id.* at 131.  Counsel for the parties agreed with this approach.  *Id.*  When the polling reached damages, the trial court asked, "Juror Number 1, do you agree with the amount of damages that was awarded by the jury?  Is that question satisfactory to counsel?"  *Id.* at 137.  Counsel for the Hospital answered in the affirmative.  *Id.*

The Hospital filed a post-trial motion requesting judgment notwithstanding the verdict, a new trial, or remittitur.  The Hospital did not challenge the unallocated nature of the damages award, but reiterated their claim that the second amendment of the complaint (regarding negligence in the TSU) was improper because it allowed a time-barred claim to be submitted to the jury.  *See* Post-Trial Motion, 2/18/2016, at 4-16.[4]  The trial court denied the post-trial motion.  Following the entry of judgment, the Hospital appealed.

On appeal, the Superior Court ruled that the trial court should not have allowed the second amendment to the Shifletts' complaint.  *Shiflett v. Lehigh Valley Health Network, Inc.*, 174 A.3d 1066, 1086 (Pa. Super. 2017).  The intermediate appellate court noted that the time frame and cast of actors alleged in connection with the PSU were different from those alleged in connection with the TSU claims, and thus held that the TSU claims were time-barred and that trial court erred by allowing the Shifletts to add them to their complaint and present them to the jury at trial.  *Id.* at 1087-88.

---

[4]  The Hospital also challenged various evidentiary rulings not implicated in this appeal.

Having reached this conclusion, the Superior Court turned to the question of whether the case would have to be remanded to the trial court.[5] It explained that because the verdict sheet did not itemize the award of damages by claim, it was impossible to know whether some of the award was attributable to the finding of negligence on the time-barred TSU claim. *Id.* at 1092. Because the allocation was unclear from the verdict sheet and the Shifletts were not entitled to recover on the time-barred TSU claim, the Superior Court concluded that a new trial limited to damages was required. *Id.*[6]

The Shifletts petitioned this Court for allowance of appeal. We granted their petition to consider a single issue:

> Did the Superior Court panel overlook or misapprehend this Court's precedent establishing that if a party does not request a special interrogatory on the verdict sheet allocating damages between causes, if has waived any objection to a general damage verdict?

*Shiflett v. Lehigh Valley Health Network, Inc.*, 191 A.3d 745 (Pa. 2018). The issue of whether a party's conduct results in waiver of an issue is a question of law; accordingly, our standard of review is de novo and our scope of review is plenary. *Jones v. Ott*, 191 A.3d 782, 787 n.7 (Pa. 2018).

Beginning with the arguments of the parties, the Shifletts argue that Pennsylvania law forecloses a retrial on damages where, as here, a general verdict is rendered, a party failed to request an apportionment of damages between claims, and there is another,

---

[5] Because of this determination, the Superior Court did not address the other issues the Hospital raised with respect to the damages awarded.

[6] Despite setting forth the scope of the trial on remand, the Superior Court ultimately granted the trial court the discretion to deviate from this mandate as to the scope if the trial court deems it necessary. *Shiflett*, 174 A.3d at 1092-94. Respectfully, we disagree with this equivocal resolution of the appeal. It did not, however, affect our review.

legally supportable finding of liability to support the award. They contend that this result is required by the well-established, general principle that the failure to raise a claim of error in the trial court results in the waiver of that claim on appeal. Shifletts' Brief at 16-17. The Shifletts assert that this rule of waiver serves to conserve judicial economy, as it affords the trial court with an opportunity to remedy the alleged error and eliminate any advantage that would accrue to unprepared counsel who treat trial as "merely a dress rehearsal." *Id.* at 17 (quoting *Dilliplaine v. Lehigh Valley Trust Co.*, 322 A.2d 114 (Pa. 1974)). The Shifletts cite to this Court's decision in *Halper v. Jewish Family & Children's Services*, 963 A.2d 1282 (Pa. 2009), which they contend supports the proposition that a retrial on damages is precluded where the defendant failed to request special interrogatories so as to be able to determine upon which theory of liability damages were awarded. Because the Hospital did not object to the verdict sheet or request special interrogatories to apportion the damages between claims, the Shifletts argue it is not entitled to a new trial. *Id.* Finally, the Shifletts draw attention to the fact that the Hospital's theory of the case at trial was that there was only one injury and that, as a result, in a retrial the Hospital would have to espouse the opposite position (that there were separate injuries in the PSU and the TSU). Shifletts' Brief at 23.

The Hospital counters the allegation of waiver by pointing to the number of occasions on which it raised with the trial court the objection that the TSU-related claims were time-barred. Hospital's Brief at 17-18. It is the Hospital's position that because the jury sheet contained special interrogatories as to each theory of liability, there was no need for them to seek additional interrogatories that would apportion damages between the claims. *Id.* at 19. The Hospital argues that in *Halper*, unlike here, the jury did not

make findings of liability as to each of the three causes of action alleged, and that this distinction was the basis for the holding in that case and the application of the general verdict rule therein. *Id.* at 24-25.

We begin our analysis with a review of our decision in *Halper*. In 1964, Jack and Marlene Halper adopted a son through the Jewish Family and Children's Service of Greater Philadelphia ("the Agency"). Throughout his life, their son David struggled with serious mental health issues, which required institutionalization in 1979 following a suicide attempt. *Halper*, 963 A.2d at 1283. In 1980, the Halpers sought the medical records of David's birth mother to gain insight into the nature of their son's problems. The Agency's file on David's birth mother included a letter from a psychiatrist stating that she suffered from schizophrenia. Through some unidentified error, while this letter was included in the Agency's file, it was never placed in David's file. As a result, the Agency did not turn the letter over to the Halpers until 1999. *Id.* Upon finally receiving the letter, the Halpers filed suit against the Agency, alleging two theories of negligence: first, that the Agency improperly failed to apprise them of the birth mother's mental health history (the "wrongful adoption" claim), and second, that the Agency negligently misfiled the birth mother's mental health information, which led to a significant delay in David being able to receive the proper psychiatric care (the "failure to disclose" claim). David asserted his own failure to disclose claim, which was substantially identical to that of his parents.

The jury returned a general verdict awarding $225,000 to the Halpers and $75,000 to David. The jury was not asked to indicate whether it found in favor of the Halpers on their wrongful adoption or failure to disclose claim or both. Both parties appealed. The Superior Court found that the Halpers presented contradictory evidence as to whether

David was suffering from schizophrenia. *Id.* at 1284. It further found that at the time of David's adoption, schizophrenia was considered to be a reactive mental disorder as opposed to a condition that could be inherited, and therefore, the Agency could not be found negligent for failing to disclose the birth mother's condition. *Id.* However, because the verdict sheet did not indicate upon which theory the jury awarded damages to the Halpers, the Superior Court found the verdict "problematic," as David could only recover under the failure to disclose claim. For that reason, it reversed judgment and remanded for a new trial, limited to David's claim. *Id.*

On appeal before this Court, we identified the crux of the issue:

> [T]he verdict slip did not differentiate between the two theories, and no special verdict slip was requested; we cannot tell if the award to the parents was based on their first theory or their second. If the award was based solely on the first theory, it cannot stand. If based solely on the second theory, it is proper.

*Id.* at 1288. To resolve the issue, we adopted the "general verdict rule," which provides that "when the jury returns a general verdict involving two or more issues and its verdict is supported as to at least one issue, the verdict will not be reversed on appeal."[7] *Id.* at

---

[7] We note that the adoption of the general verdict rule in *Halper* effected only a slight extension of Pennsylvania jurisprudence. More than thirty years before *Halper*, the Superior Court considered a case in which the trial court charged the jury on three theories of liability, including one that the plaintiff did not assert. *Connelly Containers, Inc. v. Pennsylvania Railroad*, 292 A.2d 528, 532 (Pa. Super. 1972). The jury returned a general verdict for the plaintiff. The Superior Court agreed with the defendant that the submission of the theory was erroneous; however, because no special interrogatories were submitted to the jury, it recognized that there was no way to know upon which theory the verdict was entered. *Id.* at 532-33. "In view of [the defendant's] failure to request a special verdict or interrogatories of the jurors, the apparent relative strength of the two other theories … and the fact that [the plaintiff] did not argue the [improper] theory to the jury," the Superior Court refused to disturb the judgment in favor of the plaintiff. *Id.* at 533.

1289 (citing *Dropkin v. Beachwalk Villas Condo. Assoc., Inc.*, 644 S.E.2d 808, 810 (S.C. Ct. App. 2007)).   We elaborated on the application of this rule by indicating that "a defendant who fails to request a special verdict form in a civil case will be barred on appeal from complaining that the jury may have relied on a factual theory unsupported by the evidence when there was sufficient evidence to support another theory properly before the jury."  *Id.* (quoting *Nimetz v. Cappadona*, 596 A.2d 603, 608 (D.C. 1991)).  The Court stated that adoption of the general verdict rule was necessary "because we will not shift the burden to the Halpers due to the Agency's failure to request a special verdict slip… ."  *Id.*[8]

The general verdict rule in *Halper* governs this case.  Where a plaintiff has at least one viable theory of recovery supported by competent evidence, a new trial will not be

---

[8]  Citing to decisions by other federal and state courts, the Dissent contends that the general verdict rule adopted by this Court in *Halper* is a "relatively strong variant of the harmless error approach."  Dissenting Op. at 2.  To the contrary, *Halper*'s general verdict rule is a rule of estoppel to promote judicial efficiency.  In support of adoption of the rule in *Halper*, we cited to *Nimetz v. Cappadona*, 596 A.2d 603 (D.C. 1991), in which the District of Columbia Court of Appeals held:

> Our courts are overburdened, and a plaintiff should not have to endure a second trial when the rules of procedure provide a remedy. As the court stated in *McCord v. Maguire*, supra, the litigants bear "the responsibility to request or submit special verdict forms." 873 F.2d at 1274 (citing *Landes Constr. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1374 (9th Cir. 1987)). … The instant case thus demonstrates the wisdom of the estoppel rule.

*Id.* at 608.  *Halper*'s general verdict rule is a rule of estoppel because where a litigant's failure to request a special verdict form that would have avoided the need for a new trial results in prejudice to the opposing party (in the form of having to participate in a new trial), the right to a new trial is waived.  It is a rule of fairness because, as we indicated in *Halper*, "we will not shift the burden to the Halpers due to the Agency's failure to request a special verdict slip… ."  *Halper*, 963 A.2d at 1289.

awarded where the issue complained of on appeal would have been avoided but for the defendant's failure to request a special interrogatory on the verdict sheet that would have resolved the issue. Here the Superior Court granted the Hospital a new trial to determine the amount of damages caused by the Hospital's corporate negligence in the PSU because "[i]t is impossible to determine from the verdict sheet (which did not break down damages by claim) whether all of the damages awarded by the jury were caused by Ms. Shiflett's fall in the PSU, or whether some portion of those damages was the result of the negligence found to have taken place in the TSU." *Shiflett,* 174 A.3d at 1092. As the Superior Court itself recognized in its parenthetical remark, a special interrogatory on the verdict sheet allocating damages by claim would have eliminated this quandary, as it would have clarified whether the jury's award of damages was for the Hospital's corporate negligence in the PSU, the Hospital's vicarious liability for Nurse Mahler's negligence in the TSU, or some combination of both.[9] The Hospital's failure to request a special

---

[9] The Dissent complains that the general verdict rule unfairly faults litigants for "failing to make sometimes intricate predictive judgments about potential verdicts in multi-claim cases and to incorporate these into their proposals for special verdict forms." Dissenting Op. at 3. The Dissent, however, apparently fails to recognize that trying a medical malpractice case (or, frankly, any type of case) requires counsel to make numerous "intricate predictive judgments," and that those judgments have consequences for the outcome of the case.

Moreover, the Dissent cites to *Gillespie v. Sears, Roebuck & Co.*, 386 F.3d 21, 30 (1st Cir. 2004) for the proposition that some cases present "a sufficient level of detail" that makes the use of special verdict forms "infeasible or otherwise undesirable." *Id.* Whether or not this is true will have to await another day, as this case presents no such complexity. Here, the Shifflets asserted two claims for damages resulting from the Hospital's negligence in the PSU (vicarious liability and corporate negligence) and one count for the Hospital's negligence in the TSU (vicarious liability for Nurse Mahler). The Hospital repeatedly signaled, both before and during trial, that it intended to appeal the trial court's decision not to dismiss the count for negligence in the TSU, and it should have been obvious that a new trial on damages in the event that this appeal was successful could

interrogatory allocating damages by claim, despite multiple opportunities to do so, results in a waiver of any right to a new trial.

The Superior Court's decision to grant a retrial on damages is based upon an assumption that the Shifletts suffered separate and distinct injuries from the Hospital's corporate negligence in the PSU and its vicarious liability in the TSU. The evidence introduced at trial, however, is entirely consistent with a finding that the Shifletts suffered a single injury (an avulsion fracture resulting in permanent disability) caused by the Hospital's corporate negligence in the PSU. The testimony of the Shifletts' expert witness with respect to nursing fall prevention guidelines supports the jury's finding of the Hospital's corporate negligence in the PSU. Dr. Erickson opined that Betty's fall from her bed caused the nondisplaced fracture of her fibia and increased the risk of the resulting avulsion fracture. The Hospital's own expert, Dr. Finnigan, testified that once the nondisplaced fracture occurred, avulsion was inevitable. Indeed, the Hospital never introduced any evidence at trial to support a determination that the Shifletts suffered separate and distinct injuries from its alleged negligence in the PSU and in the TSU. Accordingly, the evidence at trial supports the jury decision to award the Shifletts' $2,391,620 in damages for the Hospital's corporate negligence in the PSU. We cannot and will not presume or conjecture upon what basis the jury rendered its verdict and made the award. *See Williams v. Van Camp*, 108 A.2d 726, 727 (Pa. 1954). As such, it was within the jury's province, based upon the above-referenced evidence, to find that while Nurse Mahler was negligent in the TSU, this negligence did not result in any additional

be avoided by requesting that the jury allocate damages between injuries in the PSU and the TSU.

damages not already caused by the Hospital's corporate negligence in the PSU. Because the Shifletts have a remaining viable theory of liability (corporate negligence) and a damage award that may be fully attributable to that theory of liability, the jury's verdict must stand.

The Hospital contends that the general verdict rule adopted in *Halper* has no application to this case, for two reasons.[10] First, the Hospital contends that the issue in *Halper* arose as a result of this Court's determination that one of the parent's theories of liability was untenable because of a lack of duty on the part of the Agency, whereas in this case the Shifletts' assertion of negligence by Nurse Mahler in the TSU should not have been presented to the jury because it was time-barred. *See* Hospital's Brief at 24-25. We find this to be a distinction without a difference, as the Hospital does not explain why this distinction precludes application of the general verdict rule. Whether untenable or time-barred, both cases involve a theory of liability that should not have been submitted to the jury and a verdict sheet that does not disclose whether damages were awarded, in whole or in part, on the improperly submitted theory. Similarly, in both cases the addition of a special interrogatory on the verdict sheet could have provided the necessary clarification. As such, the general verdict rule precludes the granting of new trial.

Second, the Hospital contends that our holding in *Halper* was compelled by the fact that the verdict sheet did not distinguish between each theory of liability, whereas in this case the issue is a failure to allocate damages to each claim. *Id.* The Hospital argues

---

[10] The Hospital also argues that *Halper* is distinguishable because it involved "only one party-defendant." Hospital's Brief at 25. It is not clear how this is a distinguishing difference from the present case, which also involves a single party defendant (Hospital). The Hospital offers no argument or citation to authority in support of this contention and thus we will not address it further.

that in the present case, the verdict sheet distinguished between the Shifletts' three theories of liability and the jury rendered a verdict with respect to each of them. *Id.* Again, however, we conclude that this is a distinction without a difference, as it reads our decision in *Halper* too narrowly. In both cases, the verdict sheet lacked certainty as to the nature of the jury's verdict. In *Halper*, the verdict sheet did not disclose whether the jury awarded damages on the theory of liability improperly submitted to the jury. In the present case, the verdict form does not disclose the amount of damages, if any, awarded on the improperly submitted theory of liability. Importantly, in both cases a special interrogatory would have provided the necessary clarification, and because the defendant failed to request that a clarifying special interrogatory be added to the verdict sheet that would have obviated the need for a new trial, the verdict will stand. As we indicated in *Halper*, we will not shift to a plaintiff the burden of a new trial based upon a defendant's failure to request a clarifying special interrogatory.[11] *Halper*, 963 A.2d at 1289.

We recognize the concern of the Superior Court and the Hospital that without a new trial, there is a possibility that the Shifletts have obtained an award that may include damages awarded on a time-barred theory of liability that should not have been submitted to the jury. The record demonstrates, however, that the Hospital was acutely aware of

_____

[11]  We reject the Dissent's contention that our decision in this case constitutes "an expansion of the *Halper* precept," and that as a result, given the lack of advance notice, it should only be applied prospectively. Dissenting Op. at 3-4. To the contrary, our decision here may not in any respect be described as an expansion of the general verdict rule as adopted in *Halper*. Rather it is a straightforward application of *Halper*'s general verdict rule, as the Hospital's failure to request a special verdict form allocating damages by claim resulted in the need for a new trial to decide the allocation (which in turn results in waiver of the right to a new trial). The Hospital had clear advance notice of the general verdict rule, as *Halper* was decided seven years prior to the time of trial in the present case.

this possibility throughout the course of the trial, yet failed to request a special interrogatory that could have prevented this eventuality. Pursuant to a straightforward application of the general verdict rule, we must reverse the Superior Court's order and remand this case for consideration of the issues that the Superior Court left outstanding.

Justices Baer, Todd, Dougherty, Wecht and Mundy join the opinion.

Chief Justice Saylor files a dissenting opinion.